**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Wayne ALLARD and Gordon Berg,
Defendants-Appellees.**

No. 78–2533.

United States Court of Appeals,
Ninth Circuit.

July 17, 1979.

Francis J. Diskin, Asst. U. S. Atty., Seattle, Wash., for plaintiff-appellant.

Lawrence B. Finegold, John Henry Browne, Seattle, Wash., on brief; Timothy K. Ford, Sally Gustafson, Seattle, Wash., for defendants-appellees.

Before WRIGHT and GOODWIN, Circuit Judges, and SPENCER WILLIAMS,* District Judge.

EUGENE A. WRIGHT, Circuit Judge:

The government appeals the district court's pretrial suppression of evidence taken in the search of a hotel room. 18 U.S.C. § 3731 (1976). We affirm the trial court's findings that the warrantless entry commenced an invalid search and that no exception to the warrant requirement applied.

However, because government agents obtained a warrant subsequent to their entry based on information they possessed prior to entry, we remand to the district court to determine (1) whether the evidence the government seeks to admit was in fact tainted by the illegal entry and (2) whether the affidavit in support of the warrant was sufficient to establish probable cause for the search.

## FACTS

Douglas Richmond was arrested on March 10, 1978 for possession of cocaine. He was questioned by Special Agent Flores of the Drug Enforcement Administration (DEA). Richmond identified his source as Wayne Allard, who was to deliver to him another 12 ounces of the drug later that day. Armed with a warrant, Agents Cloke, Bagby, White and Williams went to Richond's residence at 1:30 p. m. and found Allard there. They arrested him, but found no cocaine.

* Of the Northern District of California.

Allard and Berg were registered in room 611 at a Holiday Inn. At 3:30 p. m., two of the DEA agents, White and Bagby, went there to continue their investigation. They sought no warrant.

When they knocked, Berg answered and the agents asked if he knew Allard. He said that he did and one agent asked, "We'd like to talk to you about that a little bit; may we come in?" Berg's answer was, "I suppose I don't have any choice." Once inside, the agents told him that Allard had been arrested for cocaine distribution. They asked about Berg's knowledge and participation in that operation.

The questioning continued for five to ten minutes and the agents then asked Berg's consent to search the room. Agent Bagby testified later that "(Berg) became nervous, agitated, and didn't want to give permission to search the room, even after we explained to him . . . that it would be in his best interest, so to speak."

The agents determined that they would remain, "whatever Mr. Berg did or said." Bagby called Assistant United States Attorney Currie to request a warrant to search room 611 because he had concluded that the agents had probable cause to stay in the room. Special Agent Flores conferred with Currie after the call and agreed to seek the warrant.

In his affidavit for the warrant, Flores said that Richmond had told him at 3:00 or 3:30 that "he thought that Mr. Allard would deliver an additional 12 ounces but did not have it in his immediate possession." Flores and Currie went before a magistrate and, at 5:23 p. m., approximately two hours after the entry into room 611, the warrant was issued.

During that time, the two agents stayed in the hotel room,[1] and were joined by two others; all were armed. Berg was told that he was not under arrest but Bagby testified that the agents "wouldn't have let him

leave, no sir"; "would not have left the room" if asked; and would have "bodily stayed in there" if necessary.

## DISCUSSION

The government argues that the initial warrantless entry was not a Fourth Amendment search and that no search occurred until a valid warrant was obtained. It argues alternatively that, if the entry was a search, it was justified either by consent or by exigent circumstances.

*The Search.*

■ The entry and occupancy clearly began a Fourth Amendment search. *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948). In *Johnson,* the officers believed there were drugs in a hotel room, but did not know the occupant. They knocked, the door was opened, and they asked to be admitted. The occupant stepped back and let them in. The Court held that the entry was the beginning of an illegal search and could not support a warrantless arrest.

An officer gaining access to private living quarters under color of his office . . . must *then* have some valid basis in law for the intrusion.

*Id.* at 17, 68 S.Ct. at 370. (Emphasis added.)

■ Even with probable cause to believe that a dwelling contains contraband or articles subject to seizure, there can be no search without a warrant, absent one of the recognized exceptions. *Jones v. United States,* 357 U.S. 493, 497, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958); *Agnello v. United States,* 269 U.S. 20, 33, 46 S.Ct. 4, 70 L.Ed. 145 (1925).

■ The agents in this case, instead of seeking a warrant to search before going to the hotel room, entered first. The warrantless entry was not justified by the probable

---

1. In Berg's brief supporting the motion to suppress, he alleged that, during the waiting period, "the agents opened drawers, felt under mattresses, and conducted a general but superficial search of Room 611." Agent Bagby testified

on direct examination that he looked under a pillow on the bed where Berg was sitting to check for weapons but did not otherwise search the room until the warrant arrived. There was no testimony to the contrary.

cause to believe there was contraband in the room. The later warrant could not retroactively authorize the entry.

## Consent.

■ The government asserts that Berg's statement, "I suppose I don't have any choice" was a consent to search. We disagree.

Under *Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854 (1973):

> [W]hen the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances . . . .

Here, the occupant's statement was not an expression of unequivocal and voluntary consent. From it, the district judge could reasonably have concluded that Berg knew it would be hopeless to refuse entry and that his consent was therefore not freely and intelligently given. His finding of no consent is not clearly erroneous. *See United States v. Lemon*, 550 F.2d 467, 472 (9th Cir. 1977).

## Exigent Circumstances.

■ Next, it is argued that exigent circumstances and the likelihood that evidence might be destroyed justified the failure to obtain a warrant before entry. The theory is that, if Berg had known that Allard had been arrested, the cocaine in the hotel room would have disappeared.

The district court rejected that argument, finding that it was equally probable that the agents would have had no difficulty in finding the evidence if they had had a warrant. This, too, was not clearly erroneous.

Although the threatened destruction of evidence may create exigent circumstances to justify a warrantless search, *United States v. Flickinger*, 573 F.2d 1349, 1355 (9th Cir.), *cert. denied*, 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978); *United States v. Curran*, 498 F.2d 30, 35 (9th Cir. 1974), the search cannot be justified solely because an agent knows that there is contraband on the premises.

Agents Bagby and White had little reason to suspect that any evidence in the room would be destroyed. They had no facts on which to base a reasonable belief that Berg knew of Allard's arrest or had been instructed to destroy the cocaine. They did not even know in advance that Berg was in the room.

Nor was there testimony that the agents believed exigent circumstances existed. Bagby said that he went to the hotel "to continue our investigation and to see if the person in that room could shed any light on the investigation." [2]

## Fruit of the Poisonous Tree.

■ Finally, the government contends that the evidence should not have been sup-

2. The cases cited by the government to support its claim of exigent circumstances are distinguishable. In *United States v. Picariello*, 568 F.2d 222 (1st Cir. 1978), the government deployed FBI agents to secure the defendants' apartment pending the arrival of a search warrant. There, the decision and the efforts to obtain the warrant preceded the entry. The presence of explosives in the apartment together with probable cause to believe that they might be used in fire-bombings created a real threat to the community and provided the exigent circumstances which justified securing the apartment until the warrant arrived.

In *United States v. Fulton*, 549 F.2d 1325 (9th Cir. 1977), the defendant and an informant were arrested outside the defendant's motel room. Through surveillance and information supplied by the informant, DEA agents had reason to believe that there was a third person and a quantity of heroin in the room. Under the circumstances, the agents were justified in believing that the evidence might be destroyed by the third person.

Here, the agents did not even know whether anyone would be on the premises when they arrived. They were simply investigating. They did not enter the hotel to make an arrest and none was made in the immediate vicinity of the hotel room. If exigent circumstances were created, they resulted from the agents' own conduct.

pressed because it did not result from the illegal entry, but from the search pursuant to a legal warrant.[3] In determining whether such evidence should be suppressed, the appropriate test is

> "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

*Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963), *quoting* Maguire, *Evidence of Guilt*, 221 (1959). Suppression is inappropriate where "the Government learned of the evidence 'from an independent source.'" 371 U.S. at 487, 83 S.Ct. at 417, *quoting Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

We applied these principles to determine whether evidence was tainted by an illegal search in *United States v. Bacall*, 443 F.2d 1050 (9th Cir. 1971). Without a warrant, consent or exigent circumstances to justify their actions, customs agents seized for analysis fabric imported by Bacall. They conveyed information garnered from the seizure to French police, asking them to make further investigation. That investigation produced letters from suppliers stating the true value of the fabrics, which led Customs agents to examine Bacall's bank records. The letters and bank checks were admitted in Bacall's trial for misstating the value of goods on Customs invoices.

We acknowledged that the discovery of the letters and checks was not "wholly 'independent' of the unlawful seizure." *Id.* at 1057. Nevertheless, we held that these items were not tainted by the illegal search, stressing that the "letters and checks were obtained 'without resort to any clue or knowledge gained from the items unlawfully seized,'" *id.*,[4] and that, even if the seizure directed some additional suspicion toward the transactions ultimately investigated, such leads were "*de minimis.*" *Id.* at 1059.

In two recent opinions, we rejected the proposition that evidence must be suppressed if produced during an investigation which was merely intensified because of information discovered during an illegal search. *United States v. Choate*, 576 F.2d 165, 186 (9th Cir. 1978); *United States v. Cella*, 568 F.2d 1266, 1285 (9th Cir. 1977) (as amended Jan. 18, 1978). Judge Hufstedler, concurring and dissenting in *Choate*, explained:

> While the ultimate burden of proof is on the Government to show the absence of taint, the defendant must first establish a factual nexus between the illegality and the challenged evidence. The mere establishment of an illegal search does not place upon the Government the burden of affirmatively proving that each and every piece of evidence is free from taint.

576 F.2d at 186.

■ On the record before us, we cannot determine whether the defendants estab-

---

**3.** Appellees argue that the government failed to raise this argument below and may not raise it for the first time on this appeal. The record reveals that the government raised the issue of taint, albeit indirectly, in seeking permission to file a motion for reconsideration of the suppression order.

The United States Attorney attempted to distinguish *United States v. Greenberg*, No. 76–3147 (9th Cir. March 25, 1977) (unpublished memorandum), which the district court relied upon in granting suppression. Counsel argued that, in *Greenberg*, officers entered illegally, then used facts ascertained from the illegal entry to obtain a search warrant, whereas here, the warrant affidavit contained no reference to anything seen in the room. The court responded:

> Correct, I'm well aware of that, Jerry. That doesn't make any difference though, as far as I'm concerned. I don't agree with Greenberg, either.
>
> Although the government could have pressed the point more vigorously, the court's response understandably cut off further discussion on the issue. The government should not now be foreclosed from raising the question.

**4.** We explained that the Customs agents seized the fabric to determine whether Bacall was misstating its *content* to avoid paying the required duty. The evidence eventually uncovered by the French police and by the examination of Bacall's bank records revealed that he had misstated the price he paid for the goods.

lished the requisite "factual nexus between the illegality and the challenged evidence." [5] We have examined the warrant affidavit and find in it no reference to anything observed in Room 611 by DEA agents. Nevertheless, the agents did not seek the warrant until after they had entered the room, questioned Berg, and were denied consent to search.

Agent Bagby testified that the government had learned of Allard's connection with Room 611 that morning, but then had no reason to seek a search warrant for the room. Later, agents arrested Richmond and searched his home without finding the other 12 ounces of cocaine. Agents Bagby and White entered Room 611 about the time other agents began to search Richmond's residence and Bagby called for the warrant before the search of Richmond's residence was complete.

Agent Bagby testified that he went to Room 611 to continue the drug investigation, not to search for drugs. His testimony rings true because at that time, the agents believed the drugs to be at Richmond's home. However, he also testified that he determined that he had "probable cause" to stay in the room after requesting the warrant, because of Berg's nervous reaction to the news of Allard's arrest and the request to search the room.

Agent Bagby did not explain what motivated him to seek the warrant to search Room 611. It is not clear at what point his intention to investigate ripened into a belief that there was probable cause to support issuance of the warrant. He was not asked

to reveal the contents of his discussion with United States Attorney Currie, nor did Currie testify regarding the grounds for the decision.

■ Because the only new information Bagby had at the time he called was his observation of Berg's nervousness, the inference arises that this may have motivated the request for a warrant. If Bagby's observations while in Room 611 were a substantial factor in the ultimate decision to seek a warrant, then the evidence gathered in the warrant-authorized search was tainted by the illegal entry.

In the government's favor, we note that the United States Attorney did not request the warrant until after the Richmond residence had been thoroughly searched and no cocaine was found. The results of that search, together with Richmond's statements and information derived earlier in the investigation were facts set forth in the warrant affidavit. It is entirely possible that the failure to find cocaine at the Richmond home was the primary impetus for requesting the Room 611 warrant.

The legal determination that evidence was tainted must rest on specific factual findings. Because the question of taint was not fully explored below, we must remand for resolution of the remaining factual questions. In applying the law to the facts, the court need not find that the evidence was tainted if information gained from the illegal entry merely intensified an investigation that had already focused on Room 611. *United States v. Cella*, 568 F.2d 1266, 1285–86 (9th Cir. 1977).

---

5. The trial judge apparently believed that the entire question whether to suppress the evidence from Room 611 was controlled by *United States v. Greenberg*. From the record, it appears that he read *Greenberg* to require suppression, once the illegality of the entry was established. Consequently, testimony at the hearing centered upon whether agents had any legal grounds for entering and remaining in the room.

  With respect to the district court's reliance on *Greenberg*, the Rules of this court provide:

    *Disposition as Precedent.* A disposition which is not for publication shall not be regarded as precedent and shall not be cited to or by this court *or any district court of the*

*Ninth Circuit,* either in briefs, oral argument, opinions, memoranda, or orders, except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.

Rule 21(c), Rules of the United States Court of Appeals for the Ninth Circuit (emphasis added).

  *Greenberg* was not binding upon the district court. No case cited therein suggests that an illegal entry may taint evidence found in a subsequent warrant-authorized search, where the warrant was obtained by independent means. To the extent that *Greenberg* supports such a proposition, it is inconsistent with *Choate, Cella,* and *Bacall.*

*Sufficiency of the Affidavit.*

Appellees also moved to suppress because of insufficiency of the warrant affidavit. They asserted that the affidavit, which incorporated the affidavit for the earlier warrant to search the Richmond residence, contained material misrepresentations.[6]

The court heard extensive testimony on the question of misrepresentations in the affidavits, but had not ruled on the sufficiency of either affidavit. If the court finds, on remand, that the evidence from Room 611 is free from taint, then it must determine whether the affidavit was sufficient to support the second warrant.

The case is remanded for disposition in accordance with this opinion.

SPENCER WILLIAMS, District Judge, concurring:

I concur in the majority's opinion. I wish to emphasize, however, that the trial court must be guided by the underlying remedial objectives of the exclusionary rule, when it considers the question of whether the evidence seized in Room 611 has been tainted by the agents' illegal entry.

The affidavit presented by the government in support of its request for a search warrant did not contain any information obtained as a result of the agents' presence in Room 611, and no search of the hotel room occurred until after the request for a warrant had been approved. Thus, the only connection between the agents' warrantless entry and the subsequent discovery of the evidence appears to be the extent to which observations made following the unlawful entry served as additional motivation for obtaining the warrant. With this in mind, the majority opinion sets forth the primary question concerning taint in this case quite clearly: were the observations made by agent Bagby following his illegal entry a

substantial factor in the ultimate decision to seek the warrant, or did those observations at most merely intensify the government's investigation. Suppression would be appropriate in the former circumstance, but ordinarily would not in the latter.

Unfortunately, however, no mechanical test exists to determine whether the amount by which the government's motivation to investigate Room 611 may have been heightened justifies suppression. The trial court may be required on remand to perform some delicate line drawing here, for the difference between admissibility and inadmissibility is only a matter of the degree to which the primary illegality is linked to the evidence sought to be introduced, and the extent to which the government may be said to have exploited its unconstitutional behavior.

In evaluating the facts of this case, and in drawing the necessary distinctions, the trial court must be guided by the underlying deterrent function of the exclusionary rule. As this court recently has observed, "[e]xploitation of illegalities is the focus of the fruits doctrine for the reason that the exclusionary rule is aimed at deterring police conduct in violation of the fourth amendment 'in the only effectively available way—by removing the incentive to disregard it'." *United States v. Humphries*, 600 F.2d 1238, (9th Cir. 1979). Evidence which is discovered during "merely intensified" investigations is deemed admissible because the possible deterrent value of the exclusionary rule in such cases is outweighed by the costs to society and to the truth-finding process. *Cf. Stone v. Powell*, 428 U.S. 465, 489–91, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (discussing the purpose of the exclusionary rule and its costs). Evidence which is more directly the product of illegal government activity is evidence the

---

6. The affidavit supporting the first warrant quotes Richmond as stating that the remainder of the cocaine was at his home. Appellees attempted to prove that Richmond changed his story at some time before the search of the Richmond home, and the government should have apprised the magistrate of that fact because it affected the validity of the warrant.

The affidavit supporting the Room 611 warrant incorporated the facts set forth in the first affidavit without correcting the alleged material misstatement by Richmond. Because of the incorporation, appellees argue that the second affidavit suffers from the same infirmity as the first.

suppression of which will more likely be a meaningful deterrent. *Cf. United States v. Ceccolini*, 435 U.S. 268, 275, 98 S.Ct. 1054, 1060, 55 L.Ed.2d 268 (1978) ("Recognizing not only the benefits but the costs, which are often substantial, of the exclusionary rule, we have said that 'application of the rule has been restricted to those areas where its remedial objectives are thought must efficaciously served' . . . .").

In my view it is significant in the present case that there appears to be no evidence that the agents did not, in good faith, believe that Berg had voluntarily consented to their admittance to his hotel room. Furthermore, the agents sought Berg's permission before searching the room for any contraband, and when Berg refused to give that permission they refrained from searching. The implication is that these agents were attempting to conform their investigation to the requirements of the Fourth Amendment. It is also important to me that the search did not actually take place until after issuance of a warrant, and that the warrant was based on an affidavit containing no illegally obtained information. These facts tend to indicate that the government's actions minimized any possible exploitation of the primary illegality represented by the warrantless entry. It would be a very different situation if there were any indication that the agents made their initial entry in bad faith disregard for Fourth Amendment rights, or if they had ignored Berg's refusal to permit a search, or if the search warrant later obtained had been issued on the basis of information discovered by means of the illegal entry. But if the government's investigation had already focused on Room 611 independent by Bagby's phone call, then the extent to which the primary illegality has been exploited here is slight indeed, and any possible deterrent effect arising from application of the exclusionary rule would be largely meaningless.