934 F.2d 1226
 UNITED STATES of America, Plaintiff-Appellee,
v.
Earl Charles LYNCH, Defendant-Appellant.
 No. 89-3920.
 United States Court of Appeals,
Eleventh Circuit.
 July 1, 1991.
 
 Theda R. James, Asst. Federal Public Defender, Tampa, Fla., for defendant-appellant.
 Robert Genzman, and Walter Furr, Greg Miller, Dennis I. Moore, Omer G. Poirier and Karla Spaulding, Asst. U.S. Attys., Tampa, Fla., for plaintiff-appellee.
 Appeal from the United States District Court for the Middle District of Florida.
 Before POWELL*, Associate Justice, TJOFLAT, Chief Judge, and KRAVITCH, Circuit Judge.
 TJOFLAT, Chief Judge:
 
 
 1
 The appellant, Earl Charles Lynch, challenges his convictions and sentences for possession with intent to distribute five hundred or more grams of cocaine, in violation of 21 U.S.C. Sec. 841(a)(1) (1988) and 18 U.S.C. Sec. 2 (1988), and conspiracy to commit this substantive act, in violation of 21 U.S.C. Sec. 846 (1988). Lynch seeks a judgment of acquittal on the ground that the evidence was insufficient to convict him. Alternatively, he seeks a new trial, contending that the district court's failure to exclude certain handguns found in a warrantless search of his home denied him a fair trial. Finally, he argues that the district court misapplied the Sentencing Guidelines. We disagree and, therefore, affirm Lynch's convictions and sentences.
 
 I.
 
 2
 This case arises from a six-week narcotics investigation jointly run by the Federal Bureau of Investigation and the Tampa Police Department. On December 10, 1988, Detective Kenneth Morman, acting undercover for the Tampa police force, met with Steve Warren, a codefendant of the appellant, in Tampa, Florida to discuss the purchase of illegal narcotics. At a second meeting in Pompano Beach, Florida on December 20, Morman purchased samples of Warren's narcotics; at this meeting, Warren brandished a Mack-11 machine gun at Morman. Morman arranged a final meeting with Warren on January 14, 1989 in Tampa in order to complete the narcotics purchase; Warren planned to sell three kilograms of cocaine to Morman for $73,500.
 
 
 3
 Morman picked up Warren at the Tampa airport at 1:00 p.m. on January 14. After Warren counted Morman's drug money, Warren called Mike Digaralomo, another codefendant, on Morman's car phone and arranged to finalize the transaction. Digaralomo informed Warren that the drugs had not yet arrived and instructed him to wait with Morman at a motel until he called; Warren and Morman proceeded to the designated motel, and Warren obtained a room. At approximately 10:15 p.m., Digaralomo called Warren at the motel and instructed him to bring Morman to Lynch's (the appellant's) home. Upon their arrival at approximately 10:30 p.m., Warren and Morman entered the house; inside were Digaralomo, Lynch, and Lynch's wife and young daughter. Digaralomo informed them that Jose Rodriguez, another codefendant, had not arrived with the cocaine. Although Lynch suggested that Morman wait at the house with the money so that the transaction could be completed quickly, Digaralomo instructed Morman to leave Lynch's home and await Digaralomo's call on his car phone, which he did. Before leaving, Morman observed Lynch, Digaralomo, and Warren smoking marijuana, and he noticed drug paraphernalia and firearm ammunition in the house.
 
 
 4
 At approximately 11:00 p.m., Warren called Morman to inform him that Rodriguez had arrived with the drugs and to invite Morman to return to Lynch's home and finish the deal. Morman, however, refused to complete the deal in Lynch's house and, instead, offered to meet Warren at a neutral location. Warren, in turn, insisted that they conduct the transaction inside Lynch's home; he explained that he and his companions felt safe in the house because it was guarded by pit bulls, surrounded by an electric fence, and they had guns there to protect themselves. To try to overcome this impasse, Morman agreed to speak with Warren outside Lynch's home. They could not resolve their differences at this meeting, however, and both sides called the deal off; Morman then drove Warren back to his motel, dropping him off at approximately 12:00 a.m. on January 15.
 
 
 5
 Immediately following these events, Morman and his superiors decided to arrest the individuals involved in the drug deal. Surveillance units stopped Rodriguez in his car, after he had left Lynch's home, and arrested him at approximately 1:20 a.m.; a search of Rodriguez' car produced no cocaine. Morman, accompanied by two other officers, arrested Warren in his motel parking lot at approximately 1:30 a.m.[1] At approximately 2:00 a.m., Morman and several other police officers forcibly entered Lynch's home, without a warrant, and arrested Lynch and Digaralomo; at that time, the police seized two handguns that were in their plain view. After securing the house,[2] Morman left, at approximately 2:30 a.m., to obtain a search warrant. He returned with a warrant at 4:00 a.m., at which time the police conducted a full search of the house. This search produced a rifle, various drug paraphernalia, a bag of marijuana, and nine hundred grams of cocaine.
 
 
 6
 Lynch, along with Rodriguez, Digaralomo, and Warren, were charged in a three-count indictment with conspiracy to possess with the intent to distribute five hundred or more grams of cocaine, in violation of 21 U.S.C. Sec. 846 (count I), possession with the intent to distribute five hundred or more grams of cocaine, in violation of 21 U.S.C. Sec. 841(a)(1) and 18 U.S.C. Sec. 2 (count II), and possession of a firearm during a drug-trafficking offense, in violation of 18 U.S.C. Sec. 924(c) (1988) (count III). Lynch pled not guilty.
 
 
 7
 Lynch, prior to trial, moved to suppress the firearms seized without a warrant from his home. The district court, after holding an evidentiary hearing, concluded that exigent circumstances justified the police's warrantless entry into Lynch's home. The court found that the individuals in Lynch's home posed a dangerous threat to innocent bystanders, the community, and police officers; there was also a real chance that important evidence might be destroyed. Furthermore, the court concluded that it was reasonable to assume that the coconspirators waiting in Lynch's home would become suspicious when Warren and Rodriguez did not return or contact them in some way. Thus, in order to prevent injury and loss of crucial evidence, it was necessary for the police promptly to secure Lynch's home. Accordingly, the court admitted the handguns into evidence.
 
 
 8
 The jury convicted Lynch of counts I and II--the conspiracy and possession charges; he was acquitted of count III--possession of a firearm during a drug-trafficking offense. Pursuant to the Sentencing Guidelines, a United States probation officer prepared a presentence investigation (PSI) report; Lynch filed timely objections to this report.[3] The district court, after addressing Lynch's objections, adopted the factual findings contained in the PSI and sentenced Lynch to eighty-seven months of imprisonment for each count, the sentences to run concurrently.
 
 
 9
 Lynch appeals his convictions and sentences. First, Lynch argues that the evidence produced at trial is insufficient to support his convictions. He claims that the only evidence linking him to the conspiracy is his presence at his home with the codefendants. The Government, on the other hand, contends that the evidence produced at trial demonstrated that Lynch knew that cocaine was in his home, and that he participated in the drug transaction. Added to that evidence, the Government contends, Lynch's presence during the transaction and the use of his home suggest his voluntary participation in the conspiracy. This, argues the Government, clearly was sufficient to support Lynch's convictions.
 
 
 10
 Second, Lynch contends that the district court erred in admitting into evidence the two handguns seized during the warrantless search of his home, rendering his trial unfair. He argues that since Warren and Rodriguez were arrested while away from Lynch's home, with no means to warn their cohorts, it was unreasonable for the police to assume that the individuals in Lynch's home would have been alerted in any way to the police investigation, prompting them to destroy evidence or increasing the safety risk to the community or the police. Therefore, the police were required to obtain a warrant before entering the house, and their failure to do so meant that the handguns were inadmissible.
 
 
 11
 The Government, in response, contends that the warrantless entry into Lynch's home was justified by exigent circumstances. The Government argues that it was reasonable for the police to assume that Warren's and Rodriguez' failure, following their arrests, to contact their coconspirators at Lynch's home would have aroused these coconspirators' suspicions. Thus, the Government concludes, the police--to prevent the destruction of evidence, the escape of these coconspirators, and harm to the general public and police officers--had to enter Lynch's home and arrest the coconspirators immediately; the firearms, which were in plain view within arms reach of those inside the house, were seized incident to the arrests. Accordingly, the district court properly admitted the firearms into evidence.
 
 
 12
 Finally, Lynch argues that the district court misapplied the Sentencing Guidelines in computing his sentence. In his opinion, the PSI report was based on incorrect or incomplete facts and misapplied law, and the court erred by rejecting his objections. The Government contends that the district court properly adopted the factual findings and sentencing recommendations of the PSI report.
 
 
 13
 We agree with the Government that the evidence produced at trial clearly was sufficient to support Lynch's convictions. We agree with Lynch, though, that the district court erroneously admitted into evidence the handguns seized during the warrantless search of his home. The individuals in Lynch's home had no knowledge that Warren and Rodriguez had been arrested, and there is no evidence at all to support the Government's speculation that Warren's and Rodriguez' failure to contact Lynch or Digaralomo would have aroused their suspicions. The erroneous admission of these unlawfully seized guns, however, was harmless. Accordingly, we affirm Lynch's convictions. Additionally, we affirm Lynch's sentences; in so doing, we hold that the district court's consideration at sentencing of illegally seized evidence was not error.
 
 II.
 A.
 
 14
 We first consider Lynch's argument that the evidence introduced at trial was insufficient to support his convictions. In reviewing the sufficiency of the evidence, we must determine "whether, looking at the evidence in the light most favorable to the [G]overnment, the jury necessarily must have entertained a reasonable doubt concerning the guilt of [the] appellant," United States v. Bulman, 667 F.2d 1374, 1377 (11th Cir.), cert. denied, 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982); in so doing, we draw all reasonable inferences in favor of the jury's verdict, United States v. Cruz-Valdez, 773 F.2d 1541, 1544 (11th Cir.1985) (en banc), cert. denied, 475 U.S. 1049, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986).
 
 
 15
 To prove the conspiracy charge, the Government was required to show the existence of a conspiracy, Lynch's knowing participation in it, and his criminal intent. Id. Lynch does not dispute that a conspiracy to distribute cocaine--among Warren, Rodriguez, and Digaralomo--existed; he argues that the evidence at trial failed to prove his knowing participation in that conspiracy and his criminal intent. According to him, the Government only demonstrated his mere presence at the scene of the crime and his close association with Digaralomo, Warren, and Rodriguez; this evidence, he contends, was insufficient to support his conspiracy conviction.
 
 
 16
 Contrary to Lynch's assertions, however, this is not simply a "mere presence" case. The Government presented, at trial, evidence, other than Lynch's presence at the scene of the crime, from which Lynch's knowing and intentional participation in the conspiracy could be inferred. The Government showed that Rodriguez brought some of the cocaine in a box of diapers; none of the coconspirators, however, had children who wore diapers. From this, the jury reasonably may have inferred that Lynch was aware that suspicious activity was afoot. Lynch admitted that he owned drug paraphernalia legally seized from his home. Samples of cocaine were found on pieces of glass in Lynch's bedroom, alongside identification cards belonging to Lynch and his wife; Lynch's card had cocaine residue on it. This reasonably suggested that Lynch used some of the cocaine delivered by Rodriguez or was aware that others were sampling it. Based on this evidence, then, the jury may have concluded, beyond a reasonable doubt, that Lynch knew that cocaine was present in his home.
 
 
 17
 Coupled with this evidence, Lynch's presence at the scene of the crime--indeed, the use of his home for the drug deal--is highly probative. See id. at 1545 ("the task of determining the sufficiency of the evidence ... requires an examination of all of the proved circumstances, including presence"). This circuit has recognized that "[a] jury may find knowledgeable, voluntary participation from presence when the presence is such that it would be unreasonable for anyone other than a knowledgeable participant to be present." Id. at 1546. We think that a jury may conclude that it would be unreasonable for conspirators openly to conduct a drug deal in the home of a someone not part of their conspiracy. Thus, the jury may have inferred, from Lynch's attendance at a drug deal in his own home and evidence demonstrating his knowledge that cocaine was present in his home, that Lynch knowingly and voluntarily participated, with criminal intent, in the conspiracy to distribute cocaine. Additionally, Morman testified that Lynch invited him to remain at the house and wait for the cocaine to arrive so that the transaction could be completed quickly; this also suggested that Lynch knowingly and voluntarily participated in the criminal conspiracy. We conclude that the totality of the evidence was clearly sufficient to support Lynch's conspiracy conviction.
 
 
 18
 To prove the substantive charge against Lynch, "the [G]overnment's burden was to prove ... that he knowingly possessed the [cocaine], either actually or constructively, and that he intended to distribute it." Id. at 1544. Because the presence of cocaine was uncontested, the evidence establishing Lynch's participation in the conspiracy also sufficed to prove his possession of the cocaine with intent to distribute. See id. Therefore, Lynch's conviction for possession of cocaine with intent to distribute was supported by sufficient evidence as well.B.
 
 
 19
 Lynch also challenges his convictions on the ground that the district court's failure to suppress the handguns seized during the warrantless search of his home denied him a fair trial. As we stated above, we ultimately conclude that the district court erred in admitting this evidence, but that this error was harmless. We recognize that, generally, constitutional adjudication is unnecessary when the alleged error is harmless. We reach the constitutional issue in this case, however, because the district court relied on the seized evidence in fashioning Lynch's sentences. See infra pp. 1234-37.
 
 
 20
 "[R]ulings on motions to suppress evidence involve mixed questions of law and fact." United States v. Garcia, 890 F.2d 355, 358 (11th Cir.1989). We must defer to the trial court's factual findings unless they are clearly erroneous; the trial court's application of the law to those facts is subject to de novo review. Id. at 359. In reviewing the ruling on the motion to suppress, we must construe the facts in the light most favorable to the party prevailing in the district court, in this case the Government. United States v. Campbell, 920 F.2d 793, 794-95 (11th Cir.1991).
 
 
 21
 "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). "A warrantless search is allowed, however, where both probable cause and exigent circumstances exist." United States v. Tobin, 923 F.2d 1506, 1510 (11th Cir.1991) (en banc). There is no dispute in this case that the police had probable cause to search Lynch's home. The only issue is whether exigent circumstances existed to justify the warrantless search.
 
 
 22
 While "[c]ourts have catalogued several situations in which exigent circumstances exist, ... it is clear that the exception must be applied carefully to each factual scenario." United States v. Blasco, 702 F.2d 1315, 1325 (11th Cir.1983). The exigency exception only applies when "the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." United States v. Burgos, 720 F.2d 1520, 1526 (11th Cir.1983). Recognized situations in which exigent circumstances exist include: "danger of flight or escape; danger of harm to police officers or the general public; risk of loss, destruction, removal, or concealment of evidence; and 'hot pursuit' of a fleeing suspect." Blasco, 702 F.2d at 1325. This circuit has recognized that "the need to invoke the exigent circumstances exception ... is 'particularly compelling in narcotics cases' because narcotics can be so quickly destroyed." Tobin, 923 F.2d at 1510 (quoting United States v. Young, 909 F.2d 442, 446 (11th Cir.1990). The mere presence of contraband, however, does not give rise to exigent circumstances. Id.
 
 
 23
 In this case, the Government maintains that police officers had to secure Lynch's home immediately after Warren's and Rodriguez' arrests in order to prevent the destruction of evidence, the escape of Lynch and Digaralomo, and harm to the general public and police officers. The occupants of Lynch's home, however, were unaware that they were under police investigation; Warren and Rodriguez had been arrested away from Lynch's home. It is well settled that "[c]ircumstances are not normally considered exigent where the suspects are unaware of police surveillance." Id. at 1511. As the Ninth Circuit explained:
 
 
 24
 Suspects who are inside their homes and unaware of their impending arrests generally have no reason immediately to flee, nor would they ordinarily have any reason immediately to destroy the fruits of their crime. Likewise, without more there is little reason for them to endanger the lives of themselves or others. Consequently, law enforcement officers confronting this type of situation can, without great difficulty, maintain surveillance of the premises and either wait to effectuate a valid public arrest when the suspects emerge or seek an arrest warrant from a neutral and detached magistrate.
 
 
 25
 United States v. George, 883 F.2d 1407, 1413-14 (9th Cir.1989) (citations omitted).[4]
 
 
 26
 The Government contends, and the district court ruled, that the police reasonably concluded that Lynch and Digaralomo would grow suspicious if Warren and Rodriguez did not contact them within a few hours after leaving Lynch's home; their suspicions would have motivated them to destroy evidence and flee Lynch's home. This conclusion is unsupported by any evidence. There was no indication that Warren or Rodriguez were expected, between 1:30 a.m. and 4:00 a.m., to return to Lynch's home or contact their coconspirators there.[5] The police in this case simply assumed that Lynch and Digaralomo would grow suspicious if they did not hear from their coconspirators. Such speculation, without any factual support, will not suffice to overcome the warrant requirement. See, e.g., Bulman, 667 F.2d at 1384 (mere existence of ongoing conspiracy is insufficient to create exigent circumstances); United States v. Salgado, 807 F.2d 603, 609 (7th Cir.1986) ("A mere possibility that evidence will be destroyed ... is not enough. Otherwise the requirement of a warrant would have little meaning in the investigation of drug crimes."), cert. denied, 487 U.S. 1233, 108 S.Ct. 2897, 101 L.Ed.2d 931 (1988); United States v. Allard, 600 F.2d 1301, 1304 (9th Cir.1979).[6] To hold otherwise would render the fourth amendment impotent. The police in this case had ample time and opportunity to obtain a warrant, and they should have done so. See supra note 5. Therefore, we conclude that the district court erred in failing to exclude the handguns seized during the warrantless entry into Lynch's home.
 
 
 27
 Despite our conclusion, we will not reverse Lynch's convictions if the admission of the illegally seized handguns was harmless beyond any reasonable doubt. See, e.g., Bulman, 667 F.2d at 1384. The jury acquitted Lynch of count III--possession of a firearm during a drug-trafficking offense. The remaining counts do not involve firearms and the admission of the handguns did nothing to alter the outcome on the drug charges--there is nothing to suggest that the jury's exposure to these illegally seized handguns, which the jury apparently believed were not possessed by Lynch, in any way prejudiced Lynch. Therefore, we conclude that the admission of these handguns was harmless error. Accordingly, we affirm both of Lynch's convictions.
 
 C.
 
 28
 Finally, Lynch argues that the district court erred in calculating his sentences under the federal Sentencing Guidelines.[7] We conclude that only one issue is worthy of discussion: whether the district court erred by considering the illegally seized handguns in sentencing Lynch.[8] In other words, does the exclusionary rule apply to sentencing proceedings? We hold that generally it does not, see infra note 15, and, thus, affirm Lynch's sentences.[9]
 
 
 29
 The "prime purpose" of the exclusionary rule "is to deter future unlawful police conduct." United States v. Calandra, 414 U.S. 338, 347, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974). "[T]he rule is a judicially created remedy designed to safeguard Fourth Amendment rights through its deterrent effect, rather than a personal constitutional right of the party aggrieved." Id. at 348, 94 S.Ct. at 620. Thus, the rule must be applied in light of its deterrent purpose, and courts should restrict the application of the rule "to those areas where its remedial objectives are thought most efficaciously served." Id.[10]
 
 
 30
 The Supreme Court, in Calandra, provided the analytical framework for determining whether to extend the exclusionary rule to criminal proceedings other than trials. See United States v. Vandemark, 522 F.2d 1019, 1021 (9th Cir.1975). In Calandra, the Court addressed whether to apply the exclusionary rule in grand jury proceedings. After "weigh[ing] the potential injury to the historic role and functions of the grand jury against the potential benefits of the rule as applied in this context," Calandra, 414 U.S. at 349, 94 S.Ct. at 620, the Court declined to extend the rule to grand jury proceedings. The Court concluded that the extension of the rule to those proceedings would have "achieve[d] a speculative and undoubtedly minimal advance in the deterrence of police misconduct at the expense of substantially impeding the role of the grand jury." Id. at 351-52, 94 S.Ct. at 622. Using this approach, we must weigh the potential costs to sentencing proceedings and benefits to fourth amendment principles in applying the exclusionary rule to sentencing proceedings; after doing so, we conclude that extending the rule in this context "would have a disruptive effect far out of proportion to any incremental deterrence of police misconduct." Vandemark, 522 F.2d at 1021.
 
 
 31
 Prior to the adoption of the Sentencing Guidelines, judges, in determining a proper sentence, were obligated to "conduct an inquiry broad in scope, largely unlimited either as to the kind of information [they] may consider, or the source from which it may come." United States v. Tucker, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972). Only by conducting such an inquiry could judges effectuate the modern policy of handing down individualized sentences. Williams v. New York, 337 U.S. 241, 247-48, 69 S.Ct. 1079, 1083, 93 L.Ed. 1337 (1949). As the Supreme Court explained:
 
 
 32
 A sentencing judge ... is not confined to the narrow issue of guilt. His task within fixed statutory or constitutional limits is to determine the type and extent of punishment after the issue of guilt has been determined. Highly relevant--if not essential--to his selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. And modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information....
 
 
 33
 Id. (footnote omitted). Such a process ensured that the purposes of sentencing--punishment, general deterrence, specific deterrence, and rehabilitation--were taken into account in each case.
 
 
 34
 The only limitation on the sentencing judge's broad inquiry was that the information he considered be reliable. See Townsend v. Burke, 334 U.S. 736, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (1948) (due process right to be sentenced only on information that is accurate). For that reason, a sentencing judge could not consider coerced confessions, cf. United States v. Jones, 640 F.2d 284, 287 (10th Cir.1981); In re Daley, 549 F.2d 469, 477-78 (7th Cir.), cert. denied, 434 U.S. 829, 98 S.Ct. 110, 54 L.Ed.2d 89 (1977), convictions obtained without affording the defendant the benefit of counsel, Tucker, 404 U.S. at 443, 92 S.Ct. at 589, or other information whose reliability was questionable because of constitutional deprivations.
 
 
 35
 The Sentencing Reform Act of 1984, Pub.L. No. 98-473, 98 Stat.1987 (codified as amended in scattered sections of 18 and 28 U.S.C.), codified the traditional purposes of sentencing mentioned above. It also recognized the importance of individually sentencing each defendant. 18 U.S.C. Sec. 3553(a)(1)-(2) (1988). To facilitate this task, the Act preserved a court's ability to conduct a broad inquiry into relevant factors about each defendant. Id. Sec. 3661 (1988) ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); see also Sentencing Guidelines Sec. 1B1.4 (Nov. 1, 1990).[11] Congress, however, permitted the Sentencing Commission to determine exactly which factors might be relevant in a given case. 28 U.S.C. Sec. 994(d) (1988).[12] Thus, under the Sentencing Guidelines, courts still may make broad inquiries into relevant factors, as defined by the Guidelines, when sentencing a defendant; this inquiry, as before, is limited only by the requirement that the information that the court considers be reliable. See Sentencing Guidelines Sec. 6A1.3 (Nov. 1, 1990) ("In resolving any reasonable dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissability under the rules of evidence at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").
 
 
 36
 In light of the necessity that judges consider all relevant information before imposing sentence, the detrimental effect of applying the exclusionary rule to sentencing proceedings is apparent. Evidence obtained as the result of an unconstitutional search is not inherently unreliable; rather, as explained above, it is excluded at trial in order to deter police from making illegal searches. Nor is such evidence necessarily irrelevant in sentencing. Thus, excluding all illegally seized evidence would frustrate the federal policy, codified, in part, in the Act and the Sentencing Guidelines, that judges consider all relevant and reliable facts in order to assure that each defendant receives an individualized sentence.[13]
 
 
 37
 In contrast to this clear detrimental effect on the sentencing process, "the potential benefit from extension of the exclusionary rule is slight." Vandemark, 522 F.2d at 1022; see also United States v. Lee, 540 F.2d 1205, 1211 (4th Cir.), cert. denied, 429 U.S. 894, 97 S.Ct. 255, 50 L.Ed.2d 177 (1976) (additional deterrent effect of extending exclusionary rule to sentencing "would be so minimal as to be insignificant"). "Generally, law enforcement officers conduct searches and seize evidence for purposes of prosecution and conviction--not for the purpose of increasing a sentence in a prosecution already pending or one not yet begun." Id. at 1211.[14] Thus, the only effective method to deter such official misconduct is to exclude the unconstitutionally seized evidence from the subsequent criminal prosecution, rendering it ineffective. It is unrealistic to assume that the threat that a future sentence might be less severe would significantly deter such lawlessness.[15]
 
 
 38
 Thus, after analyzing this issue, we conclude that "the disadvantages of applying the exclusionary rule at sentencing are large [and] the benefits small or nonexistent." Id. at 1212. Therefore, we decline to extend the exclusionary rule to sentencing proceedings.[16] Accordingly, we find that the district court properly considered the firearms seized from Lynch's home at sentencing and affirm Lynch's sentences.
 
 III.
 
 39
 For the foregoing reasons, the decision of the district court is AFFIRMED.
 
 
 40
 IT IS SO ORDERED.
 
 
 
 *
 Honorable Lewis F. Powell, Jr., Associate Justice of the United States Supreme Court, Retired, sitting by designation
 
 
 [1]
 According to plan, Morman called Warren and told Warren that he wanted to purchase the drugs after all; he asked Warren to meet him in the parking lot. When Warren approached Morman's car, he was arrested
 
 
 [2]
 There were four other individuals in the house at that time, including Lynch's wife and daughter; none of these individuals was arrested. They were, however, detained until Morman obtained a search warrant, in order to prevent the destruction of any evidence
 
 
 [3]
 Lynch had several objections to the PSI report. First, Lynch argued that his base offense level should have been 26 rather than 28 because the police seized only 870 grams of cocaine from his home and his coconspirators' plan to sell three kilograms of cocaine was neither known nor reasonably foreseeable to him. Sentencing Guidelines Sec. 2D1.4 (Nov. 1, 1987); id. application note 1 (Nov. 1987). Second, Lynch contended that he was entitled to a two-point reduction for acceptance of responsibility because he had attempted to cooperate with the Government. Id. Sec. 3E1.1 (Jan. 15, 1988). Third, Lynch objected to the PSI report's recommendation of a two-level increase for possession of a firearm because the jury had acquitted him of that charge. Id. Sec. 2D1.1(b)(1). Finally, Lynch objected to the PSI report's recommendation, based on his trial testimony, of a two-level increase for obstruction of justice. Id. Sec. 3C1.1 (Nov. 1, 1987)
 
 
 [4]
 The Government argues that the police could not maintain effective surveillance in Lynch's residential neighborhood; they were limited to helicopter surveillance which can only detect movement by vehicles. Because it would have been possible for someone inside the house to flee undetected on foot, the Government argues, the police needed to secure the home immediately. We will not hold that the warrantless search of an individual's home may be justified by the police's inability to maintain effective surveillance, particularly when no exigency has been established. Such a holding would run counter to all established fourth amendment precedent
 
 
 [5]
 Morman testified at the suppression hearing that it took him one hour to obtain the search warrant for Lynch's home. It is unreasonable to conclude, from the facts of this case, that the occupants of Lynch's home would have suspected that they were under police surveillance if Warren and Rodriguez failed to contact them between 1:30 a.m. and 2:30 a.m. Furthermore, Morman might have been able to obtain a search warrant after he dropped Warren off at his motel at approximately 12:00 a.m.; in that case, the warrant would have been secured by 1:30 a.m. Additionally, Morman might have been able to obtain a telephonic warrant in less than one hour. See Fed.R.Crim.P. 41(c)(2)
 
 
 [6]
 We recognize, as the Government contends, that in some cases it is reasonable for the police to assume that suspects will grow suspicious because their coconspirators, whom the police have arrested, have failed to contact them. In those cases, however, evidence supports the inference that the suspects expect to meet or contact their coconspirators before the police can obtain a warrant. See, e.g., United States v. Clement, 854 F.2d 1116, 1120 (8th Cir.1988) (per curiam) (failure of courier to return, as expected, with proceeds from specific drug transaction); United States v. Altman, 797 F.2d 514, 515 (7th Cir.1986) (per curiam) (same); United States v. Moore, 790 F.2d 13, 16 (1st Cir.1986) ("Because the sale and arrests took place immediately outside the ... apartment, the agents could reasonably believe that the failure of [the arrested cohorts] to return to the apartment promptly with the money could create a substantial risk that appellant would flee or destroy evidence."); United States v. Eddy, 660 F.2d 381, 385 (8th Cir.1981) ("[t]he evidence indicates a rather elaborate scheme ... which would have required [the arrested cohort's] speedy return to the apartment")
 In the present case, there is no evidence that either Warren or Rodriguez intended to return to Lynch's home or contact Lynch or Digaralomo. Neither Warren nor Rodriguez possessed any drugs at the time they were arrested; thus, it was unreasonable for the police to assume that, at the time of their arrests, either planned to complete a drug transaction and, thus, would have been expected to return to Lynch's home promptly. In fact, some evidence suggests that Warren had finished his dealings with Lynch and Digaralomo for the night. Warren had left Lynch's home with Morman, at approximately 11:30 p.m., to return to his motel room; he only left his room, at approximately 1:15 a.m., at Morman's behest, see supra note 1.
 
 
 [7]
 The district court, in its memorandum explaining the sentence it imposed on Lynch, stated: "There being no objections to the factual statements contained in the Presentence Report, the Court adopts those statements as its findings of fact." Of course, as we note, Lynch did object to the PSI report's factual statements. Despite its representation that Lynch made no objections, the district court did address each of Lynch's objections, on the record, at the sentencing hearing; at that time, the court afforded Lynch an opportunity to argue his points. Thus, our ability to evaluate the issues on appeal is not impaired
 
 
 [8]
 Lynch raises four other arguments. See supra note 3. There is ample evidence to support the district court's determination that Lynch was part of the entire conspiracy among Warren, Rodriguez, and Digaralomo and, thus, that his base-offense level should be determined in reference to the total amount of cocaine involved in the conspiracy (three kilograms), rather than the amount seized from his home (870 grams). Sentencing Guidelines Sec. 2D1.4; id. application note 1. Likewise, there is ample evidence--including Lynch's testimony at trial--to support the district court's conclusion that Lynch did not, in fact, accept responsibility for his crime and was not entitled to a two-point reduction based on that claim. Id. Sec. 3E1.1. Additionally, the evidence supports the district court's conclusion that Lynch testified falsely under oath; he, thus, is eligible for a two-point increase for obstruction of justice. Id. Sec. 3C1.1
 Lynch's final argument is that the district court erred in increasing his sentence based on his alleged possession of the handguns. Id. Sec. 2D1.1(b)(1). He contends that it is improper for a sentencing judge to consider allegedly unlawful conduct--in this case his alleged possession of the firearms--for which a jury previously acquitted the defendant. This circuit, however, has held that "an acquittal does not bar a sentencing court from considering the acquitted conduct in imposing sentence," if the conduct is established by reliable evidence. United States v. Rivera-Lopez, 928 F.2d 372, 373 (11th Cir.1991) (per curiam) (post-Guidelines) (quoting United States v. Funt, 896 F.2d 1288, 1300 (11th Cir.1990) (pre-Guidelines)). There was ample evidence from which the district court reliably could have concluded that Lynch possessed the firearms.
 
 
 [9]
 Although neither Lynch nor the Government addressed this issue in their briefs, they did discuss it, at our behest, at oral argument
 
 
 [10]
 Recognizing the limited value of the exclusionary rule, the Supreme Court has declined to apply it in several settings. See, e.g., United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (evidence obtained by officer relying in objective good faith on defective warrant is admissible); Stone v. Powell, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (no federal habeas corpus relief where state provides defendant full and fair opportunity to litigate fourth amendment claim); United States v. Janis, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976) (federal civil tax proceedings); Calandra, 414 U.S. at 338, 94 S.Ct. at 613 (grand jury proceedings); Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) (unconstitutionally seized evidence may be used against person other than victim of search); Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954) (impeachment of criminal defendant testifying at trial)
 
 
 [11]
 The Sentencing Commission, in promulgating guidelines, though, may not take into account the "race, sex, national origin, creed, [or] socioeconomic status of offenders." 28 U.S.C. Sec. 994(d) (1988). Nor may the sentencing judge take them into account
 
 
 [12]
 Congress gave the Commission a list of offender characteristics for the Commission to consider in determining those to be taken into account by the sentencing judge. Among these offender characteristics are age; education; vocational skills; mental, emotional, and physical condition; criminal history; and role in the offense. See id.; see also id. Sec. 994(e) (1988) (noting the general inappropriateness of considering certain factors--including education and family ties and responsibilities--in recommending terms of imprisonment.)
 
 
 [13]
 Other circuit courts of appeals have suggested that extending the exclusionary rule to sentencing proceedings might create "intolerable" delay and disruption because it would be "necessary to determine whether every piece of information to be relied upon by the sentencing judge had an ultimate lawful origin." United States v. Lee, 540 F.2d 1205, 1211 (4th Cir.), cert. denied, 429 U.S. 894, 97 S.Ct. 255, 50 L.Ed.2d 177 (1976); see also United States v. Graves, 785 F.2d 870, 873 (10th Cir.1986). We agree that such an extension would create some disruption and delay at sentencing with respect to evidence whose admissibility was not determined at trial. We note, however, that no added delay would result from applying the exclusionary rule to evidence that was excluded at trial, since the judge, in sentencing the defendant, would simply defer to the previous ruling
 
 
 [14]
 It is improbable that police officers would conduct unconstitutional searches solely to discover evidence that might enhance a defendant's sentence. Such evidence, if it was indeed damaging to the defendant with regard to sentencing, would likely be evidence of another crime or additional evidence of the charged crime (e.g., drugs or firearms). We will not assume that police officers would be willing to sacrifice any convictions on the chance that a harsher sentence might be secured for a defendant
 
 
 [15]
 We do not address--because the facts of this case do not raise the issue--whether the exclusionary rule should apply in sentencing proceedings to evidence unconstitutionally seized solely to enhance the defendant's sentence. See Verdugo v. United States, 402 F.2d 599, 610-13 (9th Cir.1968), cert. denied, 402 U.S. 961, 91 S.Ct. 1623, 29 L.Ed.2d 124 (1971). In that situation, it may be that the exclusionary rule's rationale can be served only by excluding the illegally seized evidence from consideration at sentencing
 
 
 [16]
 Our conclusion is in accord with that reached by every other circuit that has considered this issue. See United States v. McCrory, 930 F.2d 63 (D.C.Cir.1991) (post-Guidelines); United States v. Torres, 926 F.2d 321 (3rd Cir.1991) (post-Guidelines); Graves, 785 F.2d at 870 (Tenth Circuit; pre-Guidelines); Lee, 540 F.2d at 1205 (Fourth Circuit; pre-Guidelines); Vandemark, 522 F.2d at 1019 (Ninth Circuit; pre-Guidelines); United States v. Schipani, 435 F.2d 26 (2nd Cir.1970) (pre-Guidelines), cert. denied, 401 U.S. 983, 91 S.Ct. 1198, 28 L.Ed.2d 334 (1971). But see Verdugo, 402 F.2d at 599 (Ninth Circuit; applying exclusionary rule; see supra note 15)