**UNITED STATES of America, Plaintiff,**

v.

**Eric GILMER, Defendant.**

**No. 92–CR–32.**

United States District Court.
D. Colorado.

Jan. 19, 1993.

Michael J. Norton, U.S. Atty., Charlotte J. Mapes, Asst. U.S. Atty., Denver, CO, for plaintiff.

Warren R. Williamson, Asst. Federal Public Defender, Denver, CO, for defendant.

## MEMORANDUM OPINION AND ORDER

NOTTINGHAM, District Judge.

A jury has found defendant guilty of knowingly and intentionally (1) possessing marijuana; (2) possessing more than five grams of "crack" cocaine with intent to distribute; (3) carrying a firearm during a drug trafficking crime; and (4) receiving a firearm while under indictment for a crime punishable by imprisonment for a term exceeding one year. Much of the evidence supporting the jury's verdicts was seized from defendant's person or from the rented car which he was using when he was arrested for driving under the influence of alcohol on January 20, 1992. The matter is now before the court for sentencing, pursuant to the Sentencing Reform Act of 1984 and the guidelines promulgated by the United States Sentencing Commission.

The primary issue is whether the court should, in making the determinations required by the sentencing guidelines, consider drugs and weapons which the Government could not use at trial because they were the product of a search and seizure which violated the Fourth Amendment to the United States Constitution. The Government contends that I should set the base offense level by adding the drugs covered by the suppression order to the drugs which formed the basis for the jury's verdicts. The Government reasons that possession of *all* such drugs constitutes "the same course of conduct" and should thus be considered "relevant conduct" for purposes of setting the base offense level. *See* U.S.S.G. § 1B1.3 (Nov.1992). The Government also urges that I consider the suppressed weapons in deciding whether to grant its request to depart upward and impose a sentence outside the calculated guideline range.

The impact of considering the suppressed drugs would be significant. If they are not included, the total offense level for the drug offenses (calculated on the basis of the 10.667 grams of "crack" cocaine reflected in the jury's verdicts) would be 26, and the imprisonment range would be 110 to 137 months. If they are included, the total offense level for the drug offenses (calculated on the basis of 61.767 grams of "crack" cocaine) would be 32, and the imprisonment range would be 188 to 235 months. Considering all the unusual circumstances surrounding the search and seizure of the suppressed evidence, I find that the suppressed evidence was seized in an effort to enhance the sentence. I therefore decline to utilize the illegally seized evidence in calculating defendant's base offense level.

## FACTS

The unusual aspect of this case is that it involved two separate searches and seizures. As noted above, the first search and seizure occurred on January 20, 1992, when defendant was arrested for drunk driving. On the basis of the material seized that day, a federal grand jury, on January 28, 1992, returned an indictment containing the four charges of which defendant was eventually found guilty. The court thereupon issued a warrant for defendant's arrest.

Federal and local law enforcement agents arrested defendant on January 29, 1992. Claiming that they had the consent of both defendant and his girlfriend, the agents also conducted a thorough search of the dwelling outside of which defendant was arrested. This second search turned up more drugs and weapons. These new materials led the grand jury to return a superseding indictment which added three more charges against defendant.

Defendant timely moved to suppress the evidence seized during both searches. Having reviewed the evidence introduced

at a suppression hearing, I made factual findings concerning both searches. *See United States v. Gilmer*, 793 F.Supp. 1545 (D.Colo.1992), *as modified by* Order on Request for Reconsideration, 814 F.Supp. 44 (D.Colo.1992). Familiarity with these published factual findings is assumed, and the facts will not be repeated here. Based on these findings, I suppressed the evidence seized on January 29, but refused to suppress the evidence seized on January 20. The Government voluntarily dismissed the counts based on the suppressed evidence, reasoning (as it candidly acknowledged at the sentencing hearing) that it would probably obtain guilty verdicts on the remaining counts and then urge the court to use the suppressed evidence at sentencing.

## ANALYSIS

The Government contends that acceptance of its position is mandated by two decisions of the United States Court of Appeals for the Tenth Circuit. I therefore begin by reviewing these decisions, not only because they are potentially dispositive, but also because they provide the framework for analysis of the issues presented. The first decision, *United States v. Graves*, 785 F.2d 870 (10th Cir.1986), was a case where sentence had been imposed before the advent of the guidelines. The court held that the presentence report could recite, and the sentencing judge could consider, a defendant's prior offenses which remained uncharged or had been dismissed because they were based on illegally seized evidence. The court adopted a balancing approach, weighing the benefit of deterring fourth amendment violations by the police against the cost of impairing the sentencing procedure and depriving the sentencing court of reliable information. *Graves*, 785 F.2d at 873. In evaluating this balance, the court found that extension of the exclusionary rule to sentencing would, in the ordinary case, have a minimal deterrent effect on the police. The court reasoned that "in the usual case, law enforcement officers conduct searches and seize evidence for the purpose of *obtaining* convictions, not for the purpose of increasing

the sentence in a prosecution *already pending* or one not yet commenced." *Id.* (emphasis added). The court therefore concluded that the minimal incremental deterrence which might be achieved by excluding the evidence at sentencing was outweighed by the cost reflected in the limitation on the sentencing judge's ability to impose sentence in light of all relevant facts. *Id.* The court left open the question of whether the balance would tip in favor of excluding illegally seized evidence where the evidence was seized in an effort to increase the sentence in an already pending prosecution. *Id.*

Since I am imposing sentence under the guidelines, I do not believe that *Graves* compels the result which the Government urges. The balancing analysis undertaken by *Graves*, which led the court there to permit consideration of illegally seized evidence in the usual sentencing determination, does not require the same result when sentence is imposed under the guidelines. *See United States v. Nichols*, 979 F.2d 402, 409–10 (6th Cir.1992); *United States v. McCrory*, 930 F.2d 63, 70 (D.C.Cir.1991) (Silberman, J., concurring), *cert. denied*, —— U.S. ——, 112 S.Ct. 885, 116 L.Ed.2d 788 (1992); *United States v. Jewel*, 947 F.2d 224, 238 (7th Cir.1991) (Easterbrook, J., concurring). Judge Silberman's concurrence in *McCrory* points out that the guidelines are structured so as to change the significance of illegally seized evidence. By altering the significance of such evidence, they also increase the incentive of officers to seize the evidence for the purpose of enhancing a sentence. Before the guidelines, sentencing judges had a great deal of latitude in imposing sentence, and the final sentence was almost entirely at their discretion so long as the sentence did not exceed the statutory maximum. As a result, introducing illegally seized evidence at sentencing did not have predictable consequences. *McCrory*, 930 F.2d at 71. "In a sense, the very arbitrariness in the sentencing process that led to the promulgation of the guidelines meant law enforcement officials would not be likely to seize evidence illegally and then refrain from

charging crimes based upon it and instead introduce that evidence only at sentencing." *Id.* In the post-guidelines context, where the effect of illegally seized evidence is more predictable, the incentives of law enforcement officials may be very different. The incentives are almost certainly different in a case (such as the one before me) where the law enforcement officials have more than enough evidence to convict the defendant on one or more charges *before* they conduct an illegal search, the fruits of which they later seek to use at sentencing. If the police know before conducting a search (1) that they already possess evidence which will support a conviction on a relatively minor offense which has a broad statutory sentencing range and (2) that they can guarantee a sentence near the maximum of the statutory range by seizing other evidence illegally and introducing it at sentencing, then there is little to deter them from immediately seizing the evidence without obtaining a warrant. In short, the guidelines apparently permit what is in nature impossible: the tail wags the dog, and the sentencing hearing—not the trial—is frequently the point where the exclusionary rule must be applied if it is to retain any meaning at all.

The distinction between pre-guideline and post-guideline analysis is particularly vivid in the context of drug-related offenses. *See Jewel,* 947 F.2d at 240 (Easterbrook, J., concurring). The single most important ingredient in determining a guideline sentencing range is the offender's base offense level. This base offense level is set by considering all "relevant conduct." Because the base offense level for drug crimes is a function of the total amount of drugs involved, the base offense level is the same whether the defendant is tried and convicted on all the drugs involved or whether he is tried and convicted on only a portion and the rest is considered at sentencing as "relevant conduct."

To observe the result of this process, one need look no further than this case. The statutory maximum sentence for possessing 10.667 grams of "crack" with intent to distribute (an offense of which the jury found defendant guilty) is 40 years. 21

U.S.C.A. § 841(b)(1)(B)(iii) (West Supp. 1992). The guideline maximum for this amount, however, is only 137 months, even when this defendant's criminal history is considered. If I determine the base offense level by also using the 51.1 grams of "crack" seized illegally, the guideline maximum is 235 months, an increase of over eight years but still within the statutory maximum for the count of conviction. This is exactly what would have occurred had the police seized the evidence legally and obtained a conviction by introducing it. Even though the Government could not use the evidence at trial to obtain an additional conviction, it seeks to accomplish the same practical result by using it at sentencing. In this situation, the deterrent effect of the exclusionary rule vanishes if the excluded drugs are used in calculating defendant's base offense level.

Before the guidelines arrived, the sentencing judge could use his discretion to moderate this type of result. In *Graves,* for example, the district judge admitted the illegally seized evidence but refused to consider it in imposing sentence. *See Graves,* 785 F.2d at 871. Although the appellate court said that "the trial judge went beyond what he was required to do in not considering these alleged offenses," *Id.* at 876, it nonetheless affirmed the district judge's sentence. The result reached in *Graves* would be different under the guidelines. If the illegally seized evidence passes muster under a "preponderance of the evidence" standard, refusal to consider the evidence in determining the base offense level would appear to be an "incorrect application of the sentencing guidelines," mandating some form of appellate relief. *See* 18 U.S.C.A. § 3742(f) (West Supp.1992). Under the guidelines regime, the police are guaranteed the same result regardless of whether or not they conduct a lawful seizure.

The second case in which the Tenth Circuit addressed the use of illegally seized evidence at sentencing is *United States v. Jessup,* 966 F.2d 1354 (10th Cir.1992). Although *Jessup,* like *Graves,* allowed the introduction of illegally obtained evidence

for purposes of sentencing, its holding was specific to the facts in that case. The question in *Jessup* was whether the district court erred in denying credit for acceptance of responsibility when a part of the information relied on by the court was obtained after investigators had violated an Oklahoma statute prohibiting the disclosure of the identity of any person having a communicable disease. Jessup had been indicted for transporting a young boy across state lines for the purpose of engaging in prohibited sexual contact. Blood tests performed as a condition of his release on bond were positive for the Acquired Immune Deficiency Syndrome (AIDS) virus. Having learned from the victim that Jessup had continued to have sexual contact with other juveniles while he was on bond, investigators tried to discover the identity of these persons so that they could be warned of their exposure to AIDS. When one of the persons contacted was initially uncooperative, the investigators secured his cooperation by telling him that Jessup "had AIDS." Based partly on information obtained as a result of this disclosure, the sentencing court declined to award Jessup a guideline adjustment for acceptance of responsibility, reasoning that he had continued the prohibited sexual activity while released on bond.

In affirming the trial court's ruling, the *Jessup* court invoked a balancing approach which weighed "the effect of applying the exclusionary rule at sentencing against the costs of impairing effective and suitable punishment of proven offenders and unduly complicating sentencing procedures." *Id.* at 1356. On the facts of *Jessup*, the court concluded, there was no evidence that the officers' actions "were intended to secure an increased sentence for the defendant. Indeed, there is nothing in the record which suggests that the agents' actions were motivated by any purpose other than to learn the identity of other juveniles who may have been exposed to the AIDS virus through sexual contact with the defendant." *Id.* at 1357. The court did not foreclose exclusion of the illegally seized evidence in different circumstances.

The facts in *Jessup* differ markedly from those in this case. First, the case involved violation of a state statute, not the Fourth Amendment. It is by no means apparent that the exclusionary rule would ever be the proper remedy for such a violation. Second, there was no indication that the officers' actions were undertaken with a view toward securing an increased sentence for the defendant. The officers were attempting to determine the identities of other young boys who had potentially been exposed to the AIDS virus. Indeed, it is hard to discern any motive to gather the information for use at sentencing, since inclusion of this evidence would not affect the calculation of Jessup's offense level. The offense level for molestation, in contrast to offense levels for drug crimes, is not a function of a defendant's cumulative behavior. Third and most important, the Government in *Jessup* did not introduce the illegal evidence in order to increase Jessup's base offense level, as the government seeks to do here. Rather, the evidence was used solely to rebut Jessup's affirmative claim that he should receive a downward adjustment of acceptance of responsibility. For these reasons, I do not think *Jessup* is dispositive of the factual situation presented by the case now before me.

Assuming that the Tenth Circuit has not squarely addressed the question of whether a sentencing court should consider illegally seized evidence when determining the guideline base offense level for drug crimes, I now turn to decisions in other jurisdictions. Those circuits which have addressed this issue have concluded that, as a general rule, illegally seized evidence may be used under certain circumstances. Without exception, however, each of these courts explicitly notes that such evidence may be excluded if the defendant can show that the evidence was gathered to enhance the defendant's sentence. For example, in *United States v. Lynch*, the Eleventh Circuit stated:

We do not address—because the facts of this case do not raise this issue—whether the exclusionary rule should apply in sentencing proceedings to evidence unconstitutionally seized solely to enhance the

defendant's sentence.... In that situation, it may be that the exclusionary rule's rationale can be served only by excluding the illegally seized evidence from consideration at sentencing.

*United States v. Lynch,* 934 F.2d 1226, 1237 n. 15 (11th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 885, 116 L.Ed.2d 788 (1992). *See also McCrory,* 930 F.2d at 69 ("We leave open the question whether suppression would be necessary and proper at the sentencing phase where it is shown that the police acted egregiously, *e.g.,* by undertaking a warrantless search, for the very purpose of obtaining evidence to increase a defendant's sentence."); *United States v. Arango,* 966 F.2d 64, 67 (2nd Cir.1992) (noting that other Second Circuit cases have created an exception for illegally seized evidence that was obtained for the express purpose of enhancing a sentence); *Jewel,* 947 F.2d at 232 n. 11 (noting that several courts have rejected a blanket rule that the exclusionary rule never applies at sentencing); *United States v. Torres,* 926 F.2d 321, 322–25 (3rd Cir.1991) (record did not indicate that evidence was illegally seized for the purpose of enhancing the sentence).

Although these courts have permitted the use of illegally seized evidence, the fact patterns in each case differ significantly from the facts in the instant case. In *United States v. Torres,* for example, all physical evidence against the defendant was seized in the same warrantless search; therefore, police could not have known before the search that they had sufficient evidence to convict. By contrast, the present case involves two separate searches which occurred nine days apart—the second coming *after* a grand jury had indicted defendant. *See also Lynch,* 934 F.2d at 1229 (arrest and search occurred simultaneously during course of undercover sting operation); *McCrory,* 930 F.2d at 65 (arrest and search occurred during undercover sting operation; there was neither a pre-existing indictment nor a second search); *Arango,* 966 F.2d at 67 (holding that defendant, by pleading guilty, waived his right to object to constitutionality of search; therefore, court properly refused to hold

evidentiary hearing to determine whether evidence was seized illegally); *Jewel,* 947 F.2d at 232 (remanding for resentencing a complicated conspiracy case where illegally seized evidence was a videotape).

My review of the decisions, including the *Graves* and *Jessup* cases from the Tenth Circuit, leads me to conclude that the law concerning use of illegally seized evidence at sentencing consists of a general rule and an exception. The general rule is that illegally seized evidence should usually be considered in determining the sentence. The exception is harder to define. Most cases indicate that the exception would apply where the evidence was seized to enhance the sentence. *E.g., Graves,* 785 F.2d at 876; *Lynch,* 934 F.2d at 1237. Reasoning that such a standard may involve an inquiry into the officers' subjective intent, Judge Silberman has attempted to devise a more objective standard by suggesting that the exception should apply where "exclusion of the evidence is necessary to offset an unacceptably high incentive for police to violate the Fourth Amendment." *McCrory,* 930 F.2d at 71 (Silberman, J., concurring). The problem before me is whether the unusual facts in this case should be governed by the general rule or by the exception—however that exception is defined.

If the exception which the courts have explicitly carved out is to have any meaning, it must not be interpreted to require proof that the "sole" or "express" purpose of the officers' search was to increase defendant's sentence. Both Judge Easterbrook and Judge Silberman voice concern that requiring such proof would render the exception chimerical. "Officers have multiple purposes—they want to close down drug operations ..., they want to get the goods that will help turn a dope peddler against his supplier, they want to facilitate convictions, they want to maximize sentences when convictions occur. It is inconceivable that any defendant will be able to show that the police had only one of these purposes in mind when making a seizure." *Jewel,* 947 F.2d at 238 (Easterbrook, J., concurring).

■ Indeed, an inquiry into the officers' "sole" subjective motive is not only futile, but inappropriate under traditional exclusionary rule analysis. The exclusionary rule was intended to function as a prophylactic; it applies across the board in situations where the incentives for the police and the deterrence provided by the rule are such that exclusion is required, without reference to what motivated the particular search at issue. *Jewel*, 947 F.2d at 239 (Easterbrook, J., concurring). *See also McCrory*, 930 F.2d at 72 (Silberman, J., concurring) ("The majority would turn the exclusionary rule ... into a form of subjective inquiry into police motivation."). Not one Supreme Court opinion interpreting the scope of the exclusionary rule implies that the exclusionary rule applies when the police have one motive and dissolves when the police have a different one. If the exclusionary rule hinges on a subjective inquiry into the officers' "sole" or "express" motives, then "the constitutional ban on unreasonable searches and seizures will become a parchment barrier." *Jewel*, 947 F.2d at 240 (Easterbrook, J., concurring). Requiring defendant to prove the officers' "sole" or "express" motive in conducting the search would eviscerate the exception. I refuse to interpret the exception as requiring that defendant make this showing.

I am satisfied that the facts of this case justify application of the exception, regardless of precisely how the exception is defined. Indeed, it is hard to imagine a stronger case for application of the exclusionary rule at sentencing. *Cf. McCrory*, 930 F.2d at 72 (Silberman, J., concurring). When the local and federal agents conducted their illegal search on January 29, 1992, every one of them knew that the federal grand jury had already returned an indictment charging defendant with possession of 10.667 grams of "crack" and with carrying a gun during this drug trafficking offense. As the Government later implicitly acknowledged when it voluntarily dismissed the additional charges based on the illegally seized evidence, its case was virtually insurmountable. (True, defendant raised a question about the legality of the earlier search on January 20, but this issue was not a close one, legally or factually.) When viewed in light of the indictment and the strength of the Government's case, the circumstances under which the January 29 search was conducted suggest that the police sought additional incriminating evidence against defendant. What started as an alleged "protective sweep" quickly broadened in scope to a full-fledged warrantless search. If the police had really intended to do no more than ascertain that there was no one in defendant's apartment who posed a threat, they would not have sought the consent of defendant or his girlfriend to search the apartment, nor would they have searched in briefcases, under children's beds and in closets. Indeed, one of the agents admits that the January 29 search "was conducted to find if the defendant had any drugs, firearms or contraband." *Amendment to Government's Supplemental Authorities and Affidavit* at 4 (filed Sept. 21, 1992) (Affidavit of Special Agent Philip R. Miller). This agent never mentions that the search was intended to be limited to a "protective sweep." Moreover, the police had already arrested defendant outside of the apartment. Both the agents and officers admit that they purposely tried to and succeeded in arresting defendant outside of the apartment, away from the children who were believed to be inside. There was no need to then conduct a complete search of the apartment, going well beyond the scope of a "protective sweep," unless the police were specifically looking for more incriminating evidence.

The Government seeks to avoid exclusion of the illegally seized evidence by submitting affidavits from two of the federal agents primarily responsible for supervising the warrantless search. Each agent disavows any knowledge that illegally seized evidence could be used to enhance a sentence and thus concludes that the evidence was not seized for the purpose of enhancing defendant's sentence. For two reasons, I am not persuaded that the affidavits justify consideration of the illegally seized evidence. First, I consider these

self-serving disavowals in light of the agents' testimony at the pre-trial suppression hearing, which I found to be "hopelessly confused and contradictory," 793 F.Supp. at 1553, and partly false. *Continued Motions Hearing Transcript of Proceedings* at 158 (Apr. 22, 1992). I find it incredible that neither of the federal agents supervising this search, with eleven years of experience between them, had any idea that illegally seized evidence could be used at sentencing.

 Second, even if I believed the claim that the agents were ignorant of the possible use of the evidence at sentencing and could not have seized the evidence *solely* to enhance the eventual sentence in the case, I do not believe (for reasons stated earlier) that defendant must shoulder the impossible burden of proving that the agents were acting "solely" or "expressly" to enhance the sentence. It is sufficient if the circumstances demonstrate an unacceptably high incentive for the officers to violate the Fourth Amendment, regardless of their knowledge or subjective purpose. *See McCrory*, 930 F.2d at 71 (Silberman, J., concurring). The circumstances already recited—the fact that the Government had already secured an indictment based on overwhelming evidence at the time of the illegal search; the fact that anything more than a "protective sweep" for potentially-dangerous persons was wholly unnecessary unless the officers were seeking additional evidence; the confusing, inconsistent, suspicious rendition of the facts giving rise to the claimed consent to search—demonstrate that there is an unacceptably high risk here. This conclusion is reinforced by the additional bizarre fact that the agents failed to secure the premises and obtain a search warrant, *even though they consulted by telephone with an assistant United States attorney, who advised them that they did have probable cause to get a warrant. Continued Motions Hearing Transcript of Proceedings* at 103. Whatever their precise subjective knowledge or intent, I am satisfied that the agents knew they already had a solid case based on the grand jury's indictment, made no effort to undertake a legal search which would pro-

duce admissible evidence, and were indifferent concerning the legality of their search.

The conclusion which I have reached is supported by *Verdugo v. United States*, 402 F.2d 599 (9th Cir.1968), *cert. denied*, 402 U.S. 961, 91 S.Ct. 1623, 29 L.Ed.2d 124 (1971). *Verdugo*, unlike the cases which the Government cites, was decided on facts almost *identical* to the facts presented in this case. In *Verdugo*, the defendant had already been indicted on a transaction involving approximately two and a half grams of heroin. A warrant for Verdugo's arrest was issued pursuant to this charge. The following day, agents arrested Verdugo and conducted a complete search of his residence. During this search, approximately 370 grams of heroin were seized. A two-count superseding indictment was returned; the first count involving the original transaction; the second involving the evidence seized from Verdugo's home. After an evidentiary hearing, the district court held that the search of Verdugo's home violated the Fourth Amendment and granted defendant's motion to suppress. As a result, count two of the superseding indictment was dismissed. The district court found that the officers went to Verdugo's residence "to look for the contraband and to make an arrest in order to get the same." *Id.* at 610. The district court rejected the officers' testimony that they were "invited" into the home by Verdugo's wife, finding that they had "intruded themselves without her consent." *Id.* The court noted that the officers had no search warrant despite having had ample opportunity to obtain one.

Under these circumstances, the *Verdugo* court reasoned that the police's incentive to violate defendant's Fourth Amendment rights was strong:

> If the fruits of the search could be used to enhance the sentence, the possibility that the evidence might be excluded at trial would be of little importance in view of the untainted evidence available to establish the [original] offense. Unless the evidence were unavailable for sentence as well as conviction, the agents

had nothing to lose by risking an unlawful search: if the motion to suppress were denied, Verdugo could be convicted of an additional offense; if it were granted, the sentence on the original charge could still be enhanced.

*Verdugo,* 402 F.2d at 612. *Verdugo* concluded that, where the use of illegally seized evidence at sentencing provides a substantial incentive for unconstitutional searches and seizures, that evidence should be disregarded by the sentencing judge. *Id.* at 613.

### CONCLUSION

Eric Gilmer, 27 years of age, has been convicted of serious crimes and has received a substantial sentence (over 16 years) for possessing eleven grams of "crack" and carrying a handgun while doing so. The sentence was imposed partly because it was necessary to encourage his compliance with the law. Respect for, and compliance with, the law depends in some measure on the perception that it is applied evenly and that not even agents of the sovereign charged with its enforcement can violate it with impunity. Refusal to apply the exclusionary rule at sentencing, on the facts presented here at least, would render the constitutional ban on unreasonable searches and seizures "a parchment barrier." *Jewel,* 947 F.2d at 240 (Easterbrook, J., concurring). It is therefore

ORDERED that the base offense level in this case will be calculated without reference to the evidence previously suppressed and the court will not otherwise consider this evidence in imposing sentence.