**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 10 2001**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

JASON A. RYAN,

      Defendant-Appellant.

No. 99-3366

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 98-40094-01-RDR)**

---

Marilyn M. Trubey, Assistant Federal Public Defender (David J. Phillips, Federal Public Defender, with her on the brief), Topeka, Kansas, for Defendant-Appellant.

Nancy Landis Caplinger, Assistant United States Attorney (Jackie N. Williams, United States Attorney, with her on the brief), Topeka, Kansas, for Plaintiff-Appellee.

---

Before **EBEL** and **BRISCOE**, Circuit Judges, and **COOK**,* Senior District Court Judge.

---

**EBEL**, Circuit Judge.

---

    * Honorable H. Dale Cook, Senior District Court Judge, Northern District of Oklahoma, sitting by designation.

This case primarily involves the question of whether a court may, when determining a defendant's offense level, consider drugs and weapons that the Government could not have used at trial because they were the product of an unconstitutional search and seizure. The district court considered the illegally obtained evidence in reaching defendant's offense level. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM.

## BACKGROUND

This case involves three separate incidents. The first incident occurred on January 31, 1998. On that date, defendant Jason A. Ryan ("Ryan") was involved in a single-car accident in Labette County, Kansas. After Ryan left the scene, officers found several bags of methamphetamine in the immediate area of the defendant's vehicle. No charges were filed in state court with regard to this offense.

The next incident occurred on July 2, 1998. On that day, at approximately 1:00 a.m., Labette County Sheriff's Deputy Kevin Lahey stopped Ryan's car for speeding 78 miles per hour in a 65-mile-per-hour zone. After issuing a citation for speeding, Officer Lahey asked Ryan where he was going, to which Ryan responded, "Tulsa." Officer Lahey then asked Ryan if he had any weapons or drugs in the vehicle, to which Ryan replied, "no." Ryan appeared to be very nervous while answering the officer's questions.

As Officer Lahey was in the process of issuing a citation, Officer Higgins arrived as backup. Higgins testified that he would routinely back up a traffic stop if he was in the area, as was the case here. Officers Lahey and Higgins were aware, based upon information they had received about Ryan, that he was involved in drug trafficking. Specifically, the officers were aware that Ryan was obtaining methamphetamine in Tulsa, Oklahoma, and bringing it back to the Parsons, Kansas area for sale and distribution. Further, both officers were aware that Ryan had been involved in the one-car accident in January 1998, and that law enforcement officers had found methamphetamine near the scene of the accident shortly after the accident.

Officer Lahey then asked Ryan for permission to search his car. Ryan hesitated momentarily before refusing, saying that he needed to get to Tulsa. Officer Lahey then asked Ryan to step out of the vehicle so that he and Officer Higgins could use a canine to perform a sniff search of the exterior of the car. The canine alerted to two areas of the vehicle. Officer Higgins then searched the interior of the car where he found marijuana and drug paraphernalia. Ryan was then arrested. A further search of the car revealed a firearm and ten bags of methamphetamine.

On July 17, 1998, at approximately 2:00 a.m., Neosho County Deputy Sheriff David Hughes was on patrol in Neosho County, Kansas. As Deputy

Hughes was driving down a road, he noticed a vehicle with bright beam headlights traveling toward him. Deputy Hughes turned his vehicle around and stopped the driver for failing to dim the headlights. The vehicle was driven by Ryan. Deputy Hughes testified that prior to this contact with Ryan, he did not know anything about him. When Deputy Hughes approached the vehicle, he could smell a strong odor of alcohol coming from the inside of the vehicle. After checking Ryan's license, Deputy Hughes asked Ryan to step out of the vehicle to determine whether he was intoxicated. Deputy Hughes then asked if Ryan had been drinking. Ryan responded that he had had one beer. Hughes then requested permission to look inside the vehicle and Ryan consented. During the search, Hughes found two open containers of beer and a cigarette pack containing numerous ziplock bags with a small metal spoon inside. Hughes also discovered a bottle of Vitamin B, a powder often used as a cutting agent for methamphetamine and cocaine. Hughes ultimately arrested Ryan for possession of narcotics and gave him a citation for having open containers of alcohol.

Ryan was charged in United States District Court in a five-count indictment. Counts 1, 2, and 5 charged Ryan with possession with intent to distribute methamphetamine on three different dates: January 31, 1998, July 2, 1998, and July 17, 1998 respectively. Ryan was also charged with carrying a

firearm during and in relation to a drug trafficking crime and with possession of a firearm by a felon, in connection with the July 2, 1998 stop.

Ryan filed two motions to suppress evidence from the July 2 stop and the July 17 stop respectively. The district court denied the motion with regard to the July 17 stop, but granted the motion with regard to the July 2 stop. The district court found that Ryan's nervousness, his hesitation in denying the officer's consent to search, and the officers knowledge of Ryan's alleged activity in drug trafficking was insufficient to provide reasonable suspicion for the canine sniff.

On June 24, 1999, pursuant to a plea agreement with the government, Ryan pleaded guilty to Counts one and five of the indictment (possession of methamphetamine on January 31 and July 17). At sentencing, Ryan objected to the use of the suppressed evidence from the July 2, 1998 search in determining Ryan's offense level. The district court overruled the objection and considered the suppressed evidence in sentencing the defendant. Ryan was sentenced to 87 months' imprisonment on Count 1 and 87 months' imprisonment on Count 5, with the sentences to run concurrently. Counts 2, 3, and 4 were dismissed. Ryan now appeals, arguing that the district court improperly used suppressed evidence in determining his sentence. Ryan also argues that the evidence the government relied on to meet its burden of proving the quantity of methamphetamine was unreliable.

**DISCUSSION**

**I.  Application of the Exclusionary Rule to Sentencing Proceedings**

On appeal, Ryan challenges the district court's refusal to apply the exclusionary rule at sentencing to bar the consideration of certain drugs and firearms seized in violation of the Fourth Amendment by Officers Lahey and Higgins during the July 2, 1998 search of Ryan's vehicle.  The deterrent function of the exclusionary rule, according to Ryan, justifies its application at sentencing as well as at trial, particularly when the constitutional violation was egregious as Ryan argues is the situation before this court.  We conclude that the district court did not err in considering the illegally obtained evidence at sentencing.

"[T]he district court's determination that illegally obtained information can be considered for sentencing purposes is a legal conclusion requiring this court to apply certain legal principles.  Hence, the issue is primarily a legal one for which a de novo standard of review is appropriate."  United States v. Jessup, 966 F.2d 1354, 1356 (10th Cir. 1992).

We do not write upon a clean slate with regard to whether evidence obtained in violation of the Fourth Amendment can be used during sentencing.  In United States v. Graves, 785 F.2d 870 (10th Cir. 1986), a case decided before the enactment of the Sentencing Guidelines, we held that this court should balance "the incremental deterrent effect of applying the exclusionary rule at sentencing .

. . against the costs of impairing effective and suitable punishment of proven offenders and unduly complicating sentencing procedures." Id. at 873. In evaluating this balance, we found that the extension of the exclusionary rule to sentencing would, in the ordinary case, have a minimal deterrent effect on the police. We reasoned that "[i]n the usual case, law enforcement officers conduct searches and seize evidence for the purpose of obtaining convictions, not for the purpose of increasing the sentence in a prosecution already pending or one not yet commenced." Id. at 873. We thus concluded in Graves that the defendant's presentence report could recite, and the sentencing judge could consider, the defendant's prior offenses that had been dismissed or remained uncharged because they were based on illegally seized evidence, in the absence of any suggestion that the alleged offenses resulted from an attempt on the part of arresting officers to enhance the sentence imposed. Id. at 876.

In United States v. Jessup, 966 F.2d 1354 (10th Cir. 1992), we affirmed the reasoning in Graves in the context of the current sentencing guidelines. We held in Jessup that the sentencing court did not err when it denied credit for acceptance of responsibility after considering evidence that was obtained in violation of Oklahoma law. Id. at 1357. In reaching this conclusion, we looked to the balancing approach established in Graves and reasoned that because there was no evidence that the actions in Jessup were motivated by a desire to increase the

sentence of the defendant, no deterrent effect would be achieved by excluding the evidence during sentencing. Jessup, 966 F.2d at 1356-57.

While we recognize that the present case differs from Jessup in that the present case deals with a violation of the Fourth Amendment and Jessup addressed a violation of state law, it is clear that this court in Jessup contemplated the implications of its holding with regard to the admission at sentencing of evidence obtained in violation of the Fourth Amendment. In reaching our holding in Jessup, we explicitly relied on and reaffirmed the reasoning of Graves, a case that, as discussed above, allowed a sentencing judge to consider alleged offenses that were based on evidence obtained in violation of the Fourth Amendment. In addition to relying on Graves, this court in Jessup also considered cases from other circuits which explicitly addressed whether evidence obtained during an illegal search or seizure could be used at sentencing. See Jessup, 966 F.2d at 1356-57 (citing United States v. McCrory, 930 F.2d 63 (D.C. Cir. 1991), and Verdugo v. United States, 402 F.2d 599 (9th Cir. 1968)). After discussing these other cases, we relied on their reasoning in the context of a Fourth Amendment violation in reaching our conclusion that the evidence in Jessup was admissible during sentencing, absent evidence that the agent's actions were intended to secure an increased sentence for the defendant. See Jessup, 966 F.2d at 1357. Thus, despite the fact that Jessup dealt with a violation of state law, we clearly

contemplated in reaching our holding that it would be applied equally to violations of the Fourth Amendment.

Moreover, all nine other circuits to have considered this issue have determined that, in most circumstances, the exclusionary rule does not bar the introduction of the fruits of illegal searches and seizures during sentencing proceedings.  See United States v. Brimah, 214 F.3d 854, 857-59 & n.4 (7th Cir. 2000) (holding exclusionary rule at sentencing should not bar introduction of evidence seized in violation of Fourth Amendment, but leaving open question of whether rule applies when police intentionally act illegally in order to enhance defendant's sentence); United States v. Tauil-Hernandez, 88 F.3d 576, 581 (8th Cir. 1996) (holding that exclusionary rule does not apply at sentencing); United States v. Kim, 25 F.3d 1426, 1435 & n.8 (9th Cir. 1994) (admitting evidence from illegal search and seizure at sentencing, but leaving open question of whether rule applies when police intentionally act illegally in order to enhance defendant's sentence or had an "undue incentive" to so act); United States v. Montoya-Ortiz, 7 F.3d 1171, 1181 & n.10 (5th Cir. 1993) (holding exclusionary rule is generally inapplicable to sentencing proceedings, but suggesting that illegally seized evidence could be excluded if it was seized for the sole purpose of enhancing defendant's sentence); United States v. Jenkins, 4 F.3d 1338, 1344-45 (6th Cir. 1993) (permitting the use of illegally seized evidence after finding no indication

that evidence was obtained to enhance defendant's sentence)[1]; United States v. Tejada, 956 F.2d 1256, 1263 (2d Cir. 1992) ("Absent a showing that officers obtained evidence expressly to enhance a sentence, a district judge may not refuse to consider relevant evidence at sentencing, even if that evidence has been seized in violation of the Fourth Amendment."); United States v. Torres, 926 F.2d 321, 325 (3d Cir. 1991) (admitting illegally obtained evidence and reserving question of whether suppression would be necessary if illegal search was done with purpose of increasing defendant's sentence); United States v. Lynch, 934 F.2d 1226, 1236-37 & n.15 (11th Cir. 1991) (same); McCrory, 930 F.2d 63, 69 (D.C.Cir. 1991) (same).

Thus under the law of this circuit, as well as the law of other circuits to consider the issue, the district court did not err in using the evidence obtained during the illegal search and seizure of Ryan's vehicle on July 2, 1998, unless there is evidence that the officers' actions in violating Ryan's rights were done

---

[1] Ryan relies on the Sixth Circuit case United States v. Nichols, 979 F.2d 402 (6th Cir. 1992), to support his argument that the evidence should be excluded during sentencing. In Jenkins, the Sixth Circuit stated that the discussion in Nichols arguing that the exclusionary rule should apply in sentencing, was purely dicta. The court in Jenkins then went on to hold that it was "unwilling to assume that use of illegally obtained evidence will result in a corresponding decrease in the deterrent effect of the exclusionary rule on unconstitutional law-enforcement practices." Jenkins, 4 F.3d at 1345 n.4. Instead, the court followed its sister circuits and allowed the use of evidence obtained in violation of the Fourth Amendment provided there was no showing that the evidence was obtained to enhance the defendant's sentence. Id. at 1345.

with the intent to secure an increased sentence. We conclude that there is no such evidence in this case.

First, there was no case pending; thus there was no potential sentence that the officers could have been intending to enhance.[2] Second, although the court ultimately determined that the officers did not have reasonable suspicion to conduct the search, this is not a situation where the officers egregiously violated Ryan's rights. The officers believed they had reasonable suspicion based on Ryan's nervousness, his hesitation in refusing to give consent, and their knowledge of his alleged drug trafficking. There is no evidence, contrary to

---

[2] Ryan relies heavily on the District of Colorado case of United States v. Gilmer, 811 F. Supp. 578 (D.Colo 1993). The court in Gilmer held that although illegally seized evidence is generally admissible at sentencing, where there is evidence that the illegal search or seizure was conducted to enhance the defendant's sentence or where there is an unacceptably high incentive for police to violate the Fourth Amendment, the exclusionary rule should apply. Id. at 583. The court found that the facts in that case fell under the exception to the general rule. In Gilmer, officers conducted an illegal search after a federal grand jury had returned an indictment charging the defendant with possession of crack. Id. at 579. After the indictment was returned, the officers went to the defendant's house to arrest him. Although the officers arrested the defendant outside of his house, they proceeded to ransack the defendant's home. Id. What was supposed to be a "protective sweep" of the house turned into a full-blown search to find contraband. Id. at 584. The court further found that at the time of this illegal search, every one of the officers knew that the indictment had been returned. Id. Under these facts, the court found that the officers had conducted the search with the purpose of obtaining additional evidence to enhance the defendant's sentence. Id. As noted above, there is no evidence that the officers in the present case searched Ryan's car for the purpose of enhancing his sentence in a pending case, given that there were no pending charges against Ryan at the time of the illegal search.

Ryan's assertion in his brief, that the officers planned on searching Ryan's car even if it meant purposefully and knowingly violating his constitutional rights. Moreover, the evidence in the record demonstrates that this is the "usual case" referred to in Graves in which the officers conducted the search for the purpose of obtaining a conviction, and not "for the purpose of increasing the sentence in a prosecution pending or one not yet commenced." Graves, 785 F.2d at 873. We therefore conclude that the district court did not err in considering the illegally obtained evidence at sentencing.[3]

---

[3] Several opinions in other circuits have discussed the difficulties inherent in a subjective test that involves an inquiry into an officer's state of mind at the time the illegal search is conducted, and have suggested the use of a more objective test that would exclude illegally obtained evidence at sentencing where exclusion of the evidence is necessary to offset an unacceptably high incentive for police to violate the Fourth Amendment. See McCrory, 930 F.2d at 71 (Silberman, J., concurring); see also Kim, 25 F.3d at 1435 n.9 (holding that under either an objective or a subjective inquiry, the illegally obtained evidence was admissible); United States v. Jewel, 947 F.2d 224, 238-39 (7th Cir. 1990) (Easterbrook, J., concurring) (questioning a subjective inquiry). Under either an objective or subjective test, however, the evidence in this case was correctly admitted at sentencing. The facts of this case do not demonstrate that there is an unacceptably high incentive for police to violate the Fourth Amendment if this evidence is admitted at sentencing. The officers here believed, admittedly incorrectly, that they had reasonable suspicion to conduct a canine sniff of Ryan's vehicle. Their mistaken belief caused the suppression of the evidence. Under these circumstances, we find that the deterrent effect from the application of the exclusionary rule would be minimal. Therefore, we conclude that even under an objective test there is not an unacceptably high incentive for officers to violate the Fourth Amendment in this case.

## II. Drug Quantities

Ryan next contends that the district court erred in relying on the government's laboratory reports to determine the weight of the methamphetamine that was seized. According to Ryan, his expert, Dr. Lott, found the procedures used by the lab to weigh the evidence unreliable. Ryan therefore argues the district court erred in finding these reports reliable and in finding that the government had met its burden of establishing the quantity of drugs for purposes of sentencing.

When drug quantity is at issue, "[T]he government has the burden of proving the quantity of drugs for sentencing purposes by a preponderance of the evidence," United States v. Hooks, 65 F.3d 850, 854 (10th Cir. 1995), and the evidence relied upon must have a minimum indicia of reliability, see United States v. Cruz-Camacho, 137 F.3d 1220, 1225 (10th Cir. 1998). "We review the district court's calculation of drug quantities for the purpose of sentencing for clear error. We will reverse only if the district court's finding was without factual support in the record or we are left with the definite and firm conviction that a mistake has been made." United States v. Jackson, 213 F.3d 1269, 1300 (10th Cir.) (alterations, internal quotation marks, and citations omitted), vacated on other grounds, 121 S. Ct. 621, and cert. denied, 121 S. Ct. 629 (2000).

- 13 -

The district court stated in the sentencing memorandum and order that it had reviewed all of the lab reports and the expert report of Dr. Lott and was "persuaded that the procedures used by the [lab] were proper and the results are reliable." The district court found that Dr. Lott was unable "to point to any serious transgressions committed by the lab in the weighing" of the methamphetamine. Dr. Lott was only able to suggest that "certain procedures were 'not desirable laboratory practice' or 'not the most desirable approach.'"

We conclude that the district court did not err in finding the lab report reliable and sentencing Ryan based on the amounts of methamphetamine contained in that report. As support for his argument, Ryan points to certain discrepancies or irregularities in the weight and identification of the drugs in the lab report. As Dr. Lott's report itself explains, some of the irregularities in the way the methamphetamine was weighed are due to the fact that the evidence was initially analyzed for a state trial. When the trial was moved to federal court, it was necessary to reweigh the evidence for the percentage purity to get the actual weight of the methamphetamine. It appears from Dr. Lott's letter that the actual weight of methamphetamine was not necessary for the state trial. Thus, different data was required for the state trial versus the federal trial, thereby accounting for many of the "irregularities" cited by the defense. Furthermore, Dr. Lott specifically stated that although parts of the procedure followed by the lab were

not the most desirable approach, it was understandable why the procedure was used "since the amount of material was relatively small." Nowhere in the report does Dr. Lott state that the tests are unreliable or that the drug quantity would be different if alternative procedures had been followed. We therefore conclude that the district court did not clearly err when it found the report reliable and sentenced the defendant accordingly.

## CONCLUSION

For the reasons set forth above, the judgment of the district court is affirmed.