F I L E D
United States Court of Appeals
Tenth Circuit

APR 19 2005

PATRICK FISHER
Clerk

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

BRUCE WILLIS RICKEY,

      Defendant-Appellant.

No. 04-1116
(D.C. No. 03-CR-293-M)
(Colorado)

**ORDER AND JUDGMENT**[*]

Before **SEYMOUR**, Circuit Judge**, HENRY**, Circuit Judge, and **McWILLIAMS**, Senior Circuit Judge.

On June 18, 2003, in a one-count indictment filed in the United States District Court for the District of Colorado, Bruce Willis Rickey (the defendant) was charged as follows:

> On or about May 21, 2003, in the State and District of Colorado, the defendant, BRUCE WILLIS RICKEY, unlawfully and knowingly possessed a firearm and ammunition, to wit: one Amadeo Rossi S.A. Model M877 .357 caliber magnum revolver, serial number F478902; one

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Heritage Manufacturing .22 caliber revolver, serial number HR63242; one J. C. Higgins model 20 12 gauge shotgun, with no serial number; one Taurus model 669 .357 caliber revolver, serial number ND929237; and 127 rounds of CCI .22 caliber long rifle ammunition, in and affecting commerce, having been previously convicted of Smuggling Contraband into a Prison in El Paso County, Colorado District Court, case number 90CR01, a crime punishable by imprisonment for a term exceeding one year.

All in violation of Title 18, United States Code, Section 922(g)(1).

On July 18, 2003, the defendant filed a motion to suppress "all evidence and statements obtained in connection with his arrest on May 21, 2003, and all evidence and statements deriving directly therefrom, on the grounds that such evidence and statements were obtained in violation of the Fourth and Fifth Amendments." The motion was prolix, consisting of some 13 pages. In short, counsel sought to suppress evidence obtained in a search of defendant's truck, in a search of a "black briefcase" found on the seat of the truck, and the evidence later obtained in a search of the defendant's home, as well as various "statements" made by him in connection with those searches. The government filed a response to that motion. At an evidentiary hearing on defendant's motion to suppress held on August 19, 2003, two officers of the Elbert County Sheriff's office testified. The defendant did not testify. The district court held that the search of the truck was a valid "inventory search" of a vehicle which was about to be impounded, and also that the search was incident to a lawful arrest. The search of defendant's "black briefcase" was pursuant to a search warrant, and the district court held that the search of

the truck being valid, the search of the "black briefcase" was not "tainted." As to the search of defendant's house, it was conceded by the government that the evidence obtained in that search should be suppressed, since it was a warrantless search and made after the defendant had requested to see a lawyer.

Background facts as developed at the evidentiary hearing on defendant's motion to suppress will hopefully put the present case in focus. The defendant, in his own name, owned farmland in Elbert County, Colorado. One Curtis Ashcraft leased property from defendant's mother's estate immediately adjacent thereto. And therein lies our problem. Ashcraft and the defendant did not "get along," and the former obtained a restraining order which ordered the defendant to "stay off" Ashcraft's property.

On May 21, 2003, two officers of the Elbert County Sheriff's office received a dispatch order regarding an on-going "trespass" on Ashcraft's leased premises. The officers proceeded to Ashcraft's property and were met by Ashcraft, who told the officers that the defendant was "on his property, filling water in his truck" and that the defendant had previously been "legally restrained from being on his property." The officers then proceeded to the location given by Ashcraft, where they found the defendant a few hundred feet from his pick-up truck. Upon arriving at the site, Deputy Hartman got out of his vehicle and asked the defendant "who he was," to which the defendant replied, "You know who I am." Hartman explained to the defendant that he was on a call regarding a possible violation of a restraining order, to which the defendant stated that the property

belonged to him and that the restraining order had expired. He also said that his lawyer had advised him that he was allowed to go onto the property and get water for the newly planted trees on his property adjacent to Ashcraft's premises. Officer Hartman informed the defendant that because of defendant's prior threats against law enforcement officers, he would be handcuffed for "officer safety," at the same time telling the defendant that he was not under arrest. In the search of defendant's person for possible weapons, the officers removed from defendant's pockets a small knife, several knife attachments, a multi-purpose tool, and the keys to defendant's truck.

Hartman next called the dispatcher to find out if the restraining order was still in effect. After about ten minutes, Hartman was informed that the restraining order was still in effect. At that point, Hartman "arrested" the defendant for violation of a restraining order, and decided to impound defendant's truck.

After his arrest, defendant, who was handcuffed, was placed in the rear seat of the patrol car, which was then driven over to the defendant's truck. At that time the defendant expressed concern about his dog, which had been running loose. The defendant asked Officer Hartman, and his fellow officer, Nail, to enter the passenger compartment of his truck and get a leash for the dog and to put some "gloves and some fertilizer pellets inside the compartment where they would not get wet." In compliance with defendant's instructions, Officer Hartman unlocked the driver's door, placed the gloves and fertilizer pellets on the dashboard and looked for the dog leash where the

defendant had said it would be found: "under the stuff on the passenger side of the seat." In looking for the leash, Hartman moved a "black briefcase" that was "laying right in the center of the seat behind the gearshift." In so doing, he bumped the briefcase against the gearshift and heard from within the briefcase a "distinct sound–a certain rattle of boxed ammunition." Officer Hartman knew that in 1989 the defendant had been convicted of attempting to bring a gun into a detention facility and, thus being a felon, was prohibited from possessing firearms and ammunition. After Officer Hartman told Corporal Nail that he could not find any leash, Nail entered the truck cab from the passenger side, and located a leash "under a pile of items that were all located on the passenger seat." The dog was caught, put on the leash, and later taken to an animal shelter. Nail also heard ammunition rattling from within the "black briefcase," and the two officers agreed that the locked briefcase could not be opened without a search warrant. When questioned about the "black briefcase," defendant said he didn't know anything about it, refused to consent to a search of it, and asked that he be permitted to call his lawyer. The next day the officers applied for a warrant to search the "black briefcase." A warrant issued and Corporal Nail forced open the briefcase and found inside a loaded .357 caliber Taurus handgun and nine boxes and a bag of loose .38 and .357 caliber ammunition.

After questioning by federal law enforcement agents, defendant admitted that he had three guns in his residence and consented to a search of his residence, where the additional weapons identified in the indictment were found. The government conceded

that the weapons found in the search of defendant's home should be suppressed, and they were.

## I. The Search of the Truck

Defendant first argues that the district court erred in denying defendant's motion to suppress the evidence found in the search of his truck. As indicated, the district court denied that motion, holding that though there was no warrant to search the truck, the search of the cab of the truck was a valid inventory search of a vehicle about to be lawfully impounded and was a search incident to arrest, and, in either instance, did not violate the "reasonableness" requirement of the Fourth Amendment. Ours is a *de novo* review of whether the facts of a given case meet the Fourth Amendment requirement of reasonableness, and, in the course of our review, the evidence is considered in a light most favorable to the government and, in so doing, a district court's factual findings will not be disturbed unless they are clearly erroneous. *United States v. Abdenbi,* 361 F.3d 1282, 1287 (10th Cir, 2004) and *United States v. Le,* 173 F.3d 1258, 1264 (10th Cir. 1999). In our view the record supports the district court's holding that the search of the cab of the truck was a valid inventory search, and, or, a search incident to a lawful arrest. In connection with the former, *see*, for example, *United States v. Haro-Salcedo,* 107 F.3d 769, 772 (10th Cir. 1997). In connection with the latter, *see Thornton v. United States,* 541 U.S. 615 (2004) and *New York v. Belton,* 453 U.S. 454 (1981).

Further, the record indicates that the defendant "requested" the officers to enter the

truck and find a leash for his dog, which at that moment was "running wild." Retrieval of his dog was understandably important to the defendant and he asked, several times, the officers to search the truck's cab for a leash. In this setting, Officer Hartman opened the locked truck door on the driver's side and started looking for the leash, and a few moments later Officer Nail opened the door on the passenger side and found the leash. Under all these circumstances, the officers entered the truck's cab with not just defendant's consent, but his repeated requests to enter and find the dog's leash.

## II. Sentencing Enhancement

As previously stated, three weapons, each of which was identified in the indictment, were found in a search of defendant's residence. The district court, with agreement from both the government and the defendant, suppressed the use of those weapons at trial. (We are not here concerned with the propriety of that ruling.) However, at sentencing, the district court increased defendant's offense level by two levels under U.S.S.G. 2K2.1(b)(1)(A). That guideline provision states that the base offense level for one convicted under 28 U.S.C. §922(g) shall be raised by two levels if the offense involved three to seven firearms. Over defendant's objections, the district court raised defendant's base offense level by two levels based on the three firearms found in defendant's home which had previously been "suppressed" on the grounds that the search was itself unlawful. Counsel argues that it is inconsistent to suppress the use at trial of the three firearms found in defendant's home, and then turn around and, at sentencing,

increase his base offense level because of the firearms found in a search of his home. Despite any facial appeal of this argument, in our view it is foreclosed by *United States v. Ryan,* 236 F.3d 1268, 1272 (10th Cir. 2001) where we spoke as follows:

> Thus under the law of this circuit, as well as the law of other circuits to consider the issue, the district court did not err in using the evidence obtained during the illegal search and seizure of Ryan's vehicle on June 2, 1998, unless there is evidence that the officers' actions in violating Ryan's rights were done with the intent to secure an increased sentence. We conclude that there is no such evidence in this case.

We are not persuaded by counsel's suggestion that the officers who searched defendant's home had an "intent to secure an increased sentence" by their search of defendant's home and the retrieval of three firearms. In the present case, as we said in *Ryan*, "We conclude that there is no such evidence in this case." In this general connection, we reiterate that Officers Hartman and Nail were the only witnesses at the hearing on the motion to suppress, and that is the only evidentiary motion in the present record.

### III. The U.S.S.G. are Unconstitutional

Counsel suggests that under the rationale of *Blakely v. Washington,* 124 S.Ct. 2531 (2004), the "entire federal sentencing guidelines scheme is unconstitutional." In so doing, counsel recognized that "its [*Blakely's*] import and ramification has yet to be determined, and that, accordingly, counsel raises this issue for the purpose of preserving it for further review." On the present record, as well as for other obvious reasons, we are disinclined

to hold that, on the basis of *Blakely,* the "entire federal sentencing guidelines scheme" is unconstitutional.  *United States v. Booker-Fanfan,* 125 S.Ct. 738 (2005) does not compel such result.

Judgment affirmed.

ENTERED FOR THE COURT

Robert H. McWilliams
Senior Circuit Judge